77 N.J. Super. 81 (1962)
185 A.2d 410
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THOMAS SULLIVAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 15, 1962.
Decided November 13, 1962.
*83 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Alan C. Sugarman, assigned attorney, argued the cause for appellant.
Mr. Solomon Lautman argued the cause for respondent (Mr. John W. Applegate on the brief; Mr. Vincent P. Keuper, Monmouth County Prosecutor, attorney).
The opinion of the court was delivered by KILKENNY, J.A.D.
Thomas Sullivan (hereinafter "defendant") was found guilty by a jury in the Monmouth County Court of assault with intent to rob. He was sentenced to the Bordentown Reformatory for an indeterminate term. Defendant appeals from this judgment of conviction, contending that the trial court erred in denying his motions for a judgment of acquittal at the end of the State's case and at the close of the entire case, and improperly charged the jury as to the meaning of "accessory" and "intent."
The indictment charged that defendant and one Frank Picciotti did unlawfully and feloniously make an assault upon James Bova, with intent to steal, contrary to the provisions of N.J.S. 2A:90-2.
The evidence discloses these facts. James Bova, a 74-year old bartender at Bova's Bar in Long Branch, a corporate-owned tavern, left the bar by taxi for his home about 4:45 A.M. on May 13, 1961. He arrived at his residence at 263 West End Avenue, Long Branch, about 5 A.M. After leaving the taxi at the curb, Bova walked along the sidewalk on the left or west side of his house to enter by the side door. As he passed what he described as a "Christmas tree" located alongside his house, he was suddenly jumped upon by two young *84 men who were facially masked by handkerchiefs from chin to nose. Bova was knocked to the ground and started calling for help. The taxi driver, John H. Kinsey, who had driven his taxi into a driveway across the street from Bova's home to make a call into his office, heard Bova and asked, "Mr. Bova, what's the trouble?" Kinsey started to back out of the driveway, saw two figures standing over Bova, and started to blow his horn. Thereupon, the two assailants ran down the alley and went to the rear of Bova's house. Bova arose from the ground and fired two shots in the air. He went into his house and phoned the police who arrived shortly thereafter and talked with him.
Meanwhile Kinsey, upon seeing the assailants flee, put his cab in reverse and backed down West End Avenue in a westerly direction toward Westwood Avenue. He could see two figures run through the field behind Bova's house and the adjoining houses toward Wooley Avenue. Kinsey then lost sight of the two figures but continued to back up. As he came onto Westwood Avenue, he saw a car come out of Wooley Avenue and head south along Westwood Avenue. He took notice of the driver and wrote down the license number. Kinsey drove north towards the high school to see if he could see anyone running and, when he didn't, returned to Mr. Bova's house and thence to the cab office.
Approximately 15 minutes later, Kinsey was standing outside the cab office and looking in the direction of the Rockwell Diner when he saw driven up in front of the diner a car similar to the one which earlier had come out of Wooley Avenue. He called the police from a nearby police call box, then drove his cab toward the diner. Before reaching it, the car pulled away. Defendant was driving the car and the license number was the same as that previously noted. Kinsey followed the car until it was parked in front of defendant's house. He notified police headquarters and police were dispatched to the scene. Later, at police headquarters, Kinsey identified the car and defendant as its driver. He did not identify defendant as one of the two figures whom he had *85 seen standing over Bova or running through the field behind Bova's house.
Several policemen went to defendant's house and there inspected the car reported to them by Kinsey. Some garden type dirt was found in the front and rear of the car. They were informed by defendant, who answered their knock on the door, that he was the owner of the car. Defendant invited the officers inside and they interrogated him as to his whereabouts that evening and were told that he had been out riding because he could not sleep and had just arrived home after having been at the Rockwell Diner.
Captain Purcell of the detective bureau soon joined the other officers at defendant's house. Defendant's younger brother Curt, 16-years old, and their mother Carmella were also present. Since the weather had been foggy and somewhat damp, and the field behind Bova's house somewhat muddy, the officers requested to see defendant's shoes and clothes and defendant voluntarily produced them. Upon their inspection, the police found them to be clean and dry. They also checked the shoes and clothing of defendant's brother Curt and discovered that shoes, admittedly his, were muddy and the legs of his pants, from the knees down, were damp. Both defendant, who was 19 years old, and his brother Curt denied any participation in the crime.
Defendant and Curt were taken to police headquarters and defendant's car was impounded. Bova was then brought to headquarters about 8 A.M. and there identified defendant and his brother as his assailants.
Curt Sullivan subsequently admitted to the police and testified at the trial as a witness for the State that he was one of Bova's assailants. In his testimony he referred to this assault as a robbery. Curt was not indicted because of his age. Curt had given a statement to the police after his arrest, as a result of which the codefendant, Frank Picciotti, was apprehended and subsequently indicted. At the trial, however, Curt denied that either Picciotti or the defendant was the other assailant. He claimed that it was some person, *86 known to him only as "Al," whom he had met for the first time at the diner only a few hours before the assault. The State claimed surprise and sought to neutralize Curt's testimony, but offered no further evidence implicating Picciotti, who denied all participation in the crime. Picciotti's motion for a judgment of acquittal at the close of the State's case was denied, but upon its renewal at the end of the entire case was granted.
Defendant's motion for a judgment of acquittal at the end of the State's case on the ground that there was no evidence supporting the charge of an intent to steal was denied. We refrain from deciding the propriety of that ruling because, for other reasons hereinafter stated, we are reversing the judgment of conviction and remanding the case for a new trial. A reversal for lack of sufficient evidence of guilt does not ordinarily warrant an appellate judgment of acquittal. See State v. Croland, 31 N.J. 380, 384 (1960). The preferred practice is the grant of new trial. Ibid. For aught we know, the State may produce at that new trial stronger and better proof of the intent to steal or rob, which may clearly satisfy the test for sufficiency of proof as most recently laid down in State v. Fiorello, 36 N.J. 80, 89-90 (1961).
Defendant testified concerning his movements during the evening hours immediately preceding the assault upon Bova. He left his house at 7:45 P.M. on May 12 and went to the Rockwell Diner. He met one Russell Ullery and drove him up to town to pick up Russell's girl friend who was arriving by bus from New York. After picking up the girl, all three returned to the diner. Later, Thomas Ullery arrived at the diner and he and defendant drove down to the boardwalk and then took a ride. When they came to the Rockwell Diner again at about 2:25 A.M., Donald Ullery asked defendant to drive him to Toms River, where his mother lived and from whom he wanted to get some money. Defendant consented, drove Donald Ullery to Toms River and back, and returned to his home about 5 A.M.
Defendant further testified that he stopped at his house to *87 pick up Donald's jacket before taking Donald home. Upon going into the house he discovered that Curt was not home. He then recalled that Curt had told him on the preceding evening that he was going to Bova's early in the morning. He said that he had cautioned his brother about staying out of trouble because young Curt was on probation for a previous offense. Defendant admitted on cross-examination for the purpose of affecting his credibility as a witness that he, too, had been previously convicted of robbery, had received a suspended sentence and had been placed on probation for three years in October 1960.
Defendant said that he and Donald then drove to Bova's house, which he understood was near the high school, but he did not see his brother or his brother's car. Thereupon defendant drove Donald home, following which he returned to the diner, where he asked a waitress if she had seen his brother. Her reply was in the negative and defendant then left for his home, arriving there about 6 A.M., shortly before the police officers arrived.
Defendant's testimony was substantially corroborated by Donald Ullery and the waitress at the diner, who testified in his behalf.
Defendant also moved for a judgment of acquittal at the close of all the proofs, and this motion was denied. We refrain from deciding the correctness of this trial ruling for the same reason set forth above with reference to the motion for a judgment of acquittal at the end of the State's case.
During the trial the State modified its original theory of defendant's criminal responsibility. The indictment charged that the defendant and Picciotti committed the assault upon Bova. In opening to the jury the assistant prosecutor said in elaboration thereof that defendant and Picciotti "lay in wait for this James Bova while he was going home and they attacked him for the purpose of robbing or stealing his money from him but after they had thrown him down and assaulted him" his screams attracted the attention of the taxi driver who had brought Bova home and he began blowing his horn *88 and scared them away. The State's witness Bova testified that defendant and his brother Curt were the two who assaulted him. Curt, testifying as a witness for the State, stated that he was one of the two assailants, but that neither defendant nor Picciotti was the other. He identified the second assailant as a totally different person, the comparatively unknown "Al."
However, in summation, the assistant prosecutor advanced for the first time the alternate theory that defendant may have been an accessory, the driver of the getaway car. This may have been induced by the police testimony that no mud was found on defendant's shoes and his clothes were not damp, so that defendant may not have been one of the two who ran across the damp, muddy field behind Bova's house. He told the jury:
"In New Jersey everybody as an accessory is just as guilty as a principal, whether you help before, after or at or after the crime."
However, in its original charge the trial court made no mention of the word "accessory" or of the law relating to an accessory, despite the advancement of that alternate theory in the state's summation.
The failure to explain the role of an accessory and his responsibility for the crime charged caused some confusion in the minds of the jurors. About an hour and a half after retiring, the jury returned to the courtroom and requested the trial judge to answer certain questions posed in its behalf by the foreman. Thus, it asked:
"If he Thomas Sullivan was by prearrangement or accident an accessory after the fact is he to be considered guilty under the indictment as raised equally if he were an accessory before the fact? Is he to be considered guilty under the indictment as raised in the indictment if he knows and does nothing about the crime to be committed constitute accessory?"
The court's reply was:
"Well, while the Court did not charge you specifically on that in the main part of its charge, he is charged here with an assault with *89 intent. Now, the other information as the Court has already charged you was circumstantial. The intent if it is to be spelled out it would seem to be to the Court would have to be inferred from facts that had been testified to that you heard upon the stand. Whether or not he was an accessory before the event or after the event is still a fact question for you folks to determine."
This response was not an adequate answer; in fact, it did not tell the jury what it needed to know. The trial judge should have explained the difference between a principal and an accessory, and the distinction between an accessory before or to the fact who is punishable as a principal under N.J.S. 2A:85-14, and an accessory after the fact whose crime is separate and distinct from the principal offense, being a misdemeanor and punishable under N.J.S. 2A:85-2. The trial court should have told the jury that, if it found that the defendant, by prearrangement, was present at the scene of the crime to render aid in its perpetration, or within a sufficient distance of the scene to render aid to those who actually committed the assault, or was there by common design performing the part assigned to him, such as a lookout, or driver of the getaway car, he could be convicted as principal under N.J.S. 2A:85-14. See Roesel v. State, 62 N.J.L. 216, 222 (E. & A. 1898); State v. Carlino, 98 N.J.L. 48, 52 (Sup. Ct. 1922), affirmed 99 N.J.L. 292 (E. & A. 1923).
The trial court did not give the jury any understanding of the meaning of an accessory after the fact. At common law an "accessory after the fact" was one who "with knowledge of another's commission of felony, receives, relieves, comforts, or assists the felon in order to hinder the [latter's] apprehension, trial or punishment." Skelly v. United States, 76 F.2d 483, 487 (10 Cir. 1935); 1 Schlosser, Criminal Laws of New Jersey, § 116, p. 88 (1953); Wharton's Criminal Law, (12th ed.), § 281, p. 368; 14 Am. Jur., Criminal Law, § 102, p. 836 (1938). We note, too, that at common law the accessory after the fact was subject to the same punishment as the felon he aided, even death in capital *90 cases. 4 Blackstone Commentaries 39. In New Jersey the severity of the common law has been mitigated and accessories after the fact are dealt with under N.J.S. 2A:85-2, which makes their offense only a misdemeanor. An accessory after the fact "cannot be charged, or punished as the principal offender. His offense is distinctly his own, and he is liable to a different punishment; nor can he be indicted jointly with the principal for the principal's offense. Com. v. Wood, 11 Gray [77 Mass.] [85], 86." State v. Umble, 115 Mo. 452, 22 S.W. 378, 380 (Sup. Ct. 1893). See, too, People v. Chadwick, 7 Utah 134, 25 P. 737, 738 (Sup. Ct. 1891), holding that "one who is a principal cannot be an accessory after the fact"; and People v. Galbo, 218 N.Y. 283, 112 N.E. 1041, 1045, 2 A.L.R. 1220 (Ct. App. 1960).
The trial court in this case should have instructed the jury that if it found that the defendant was an accessory after the fact, within the statutory definition of N.J.S. 2A:85-2, he could not be convicted on an indictment charging him as a principal in the commission of the crime of assault with intent to rob. 1 Wharton's Criminal Law (12th ed.), § 285, p. 373.
"The offense of which an accessory after the fact may be guilty is not included in, nor has it any connection with, the principal crime. * * * The one cannot be committed until the principal offense is an accomplished fact. It therefore necessarily follows that in the absence of statute, an accessory after the fact must be indicted and convicted as such, and that a person charged in an indictment as principal cannot be convicted on evidence showing him to be only an accessory after the fact." 27 Am. Jur., Indictments and Informations, § 96, p. 666 (1940).
The crime of being an accessory after the fact is dissimilar from that of the principal in its fundamental characteristics, and must be distinctly charged in the indictment.
The jury's confusion as to the meaning of "accessory" was further manifested by the following vague question asked by its foreman:
*91 "May I ask one other question sir? The combination of words assault with intent does not according to your definition necessarily mean that the active perpetration is the primary word to be considered by us in trying to establish the definition of accessory?"
The following reply by the trial court did not clear up that confusion, but probably compounded it:
"You have that as you have very definitely raised the point here and which is something for your determination as to whether he actually participated in the assault at the time or whether he was associated with it and became an accessory after the fact. These are all fact questions for you to determine."
We are satisfied from the foregoing that the jury was not properly instructed as to the meaning and criminal responsibility of an accessory.
The trial court did not answer the jury's question as to whether a person would be an accessory to a crime if he merely knew that the crime was to be committed and did nothing about it. The trial court here should have told the jury that such knowledge and failure to act would not constitute the defendant an accessory and that he could not be convicted of the crime charged against him on that basis.
The jury foreman also asked the trial court the following question:
"Within the definition of intent does direct participation at the scene of the crime committed constitute intent only or does knowledge of the crime constitute it?"
This question was far from clear and quite unintelligible. Instead of asking for a clarification of the question, the trial court in substance told the jury that those were fact questions which it would have to determine.
The jury was clearly confused as to the law applicable to the facts in the case, as manifested by its several questions when it returned for further instructions. The jury did not receive from the trial court definite, clear and complete answers to its questions, or instructions as to the law, *92 particularly in relation to the possible guilt of the defendant as an accessory. It was particularly important to the defendant that such answers be given in view of the State's summation on the theory of accessory "before, after or at or after the crime." We find that by reason thereof prejudicial error was committed by the trial court in these supplemental instructions to the jury. We need not invoke the plain error rule here, R.R. 1:5-1(a). The defendant's attorney did specifically object to those additional instructions. As to whether knowledge of the crime before it is committed makes a person an accessory to the crime, he called the court's attention to the fact that the question had not been answered. He also stressed the lack of an adequate charge on the subject of "accessory."
While not necessary for this decision or even raised by the defendant on this appeal, we call attention to the following obviously erroneous statement of the law made by the assistant prosecutor in his summation:
"I assure you that the Judge will charge you that an alibi has to be proven by a preponderance of the evidence by the defendant. The defendant cannot come in here and alibi and then we have to worry about going through and proving that his alibi is no good."
The trial court did not give this incorrect charge to the jury. This statement should not be repeated on the retrial of this action. The defendant is not required to prove his alibi or to prove that he was not present at the scene of the crime. State v. Mucci, 25 N.J. 423, 431 (1957); State v. Wines, 47 N.J. Super. 235, 240 (App. Div. 1957).
We have reviewed the other grounds for reversal urged by the defendant and find they are without any substantial merit.
We commend defendant's assigned attorney for his diligent and competent efforts in defendant's behalf both at the trial and on this appeal.
In view of the foregoing, the judgment is reversed and remanded to the County Court for a new trial.