983 A.2d 181

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. QUADIR
WHITAKER, DEFENDANT–RESPONDENT.

Argued September 15, 2009—Decided December 7, 2009.

*Carey J. Huff*, Assistant Prosecutor, argued the cause for appellant (*Luis A. Valentin*, Monmouth County Prosecutor, attorney; *Mary R. Juliano*, Assistant Prosecutor, on the brief).

*Kevin G. Byrnes*, Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars*, Public Defender, attorney).

*Robert E. Bonpietro*, Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Anne Milgram*, Attorney General, attorney; *Mr. Bonpietro* and *Frank J. Ducoit*, Deputy Attorney General, on the brief).

Justice ALBIN delivered the opinion of the Court.

Defendant Quadir Whitaker was convicted of robbery and felony murder based on accomplice liability. The issue before the jury was whether defendant aided and abetted Greg Davis in the robbery and shooting death of the victim. In summation, the prosecutor told the jury that it could convict defendant as an accomplice to robbery and felony murder, regardless of whether defendant participated in or shared Davis's intent to commit a theft or played any role in killing the victim, so long as he assisted Davis in disposing of the murder weapon as the two men fled the crime scene.

The Appellate Division reversed defendant's conviction, rejecting the State's legal theory that would allow defendant's conviction

of robbery and felony murder for merely concealing evidence or hindering Davis's apprehension after commission of the crimes. We affirm the Appellate Division for reasons rooted in basic tenets of criminal culpability set forth in the New Jersey Code of Criminal Justice (Code).

Under the Code, accomplice liability requires that a defendant act "[w]ith the purpose of promoting or facilitating the commission of the offense." *N.J.S.A.* 2C:2–6(c)(1). Defendant could not be found guilty of robbery and felony murder unless he *shared* Davis's intent to commit a theft before or at the time that Davis shot the victim. Because the prosecutor improperly advised the jury that it could convict defendant of robbery and felony murder solely on the ground that he aided Davis in his escape, even if he did not participate or assist in any way in the attempted theft or killing, we are constrained to order a new trial.

I.

In a multi-count indictment, a Monmouth County Grand Jury charged defendant Quadir Whitaker and co-defendant Greg Davis with first-degree armed robbery, *N.J.S.A.* 2C:15–1; felony murder, *N.J.S.A.* 2C:11–3(a)(3); purposeful or knowing murder, *N.J.S.A.* 2C:11–3; third-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39–5(b); and second-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4(a).[1] Defendant Whitaker was tried alone before a jury. The State's theory was that defendant acted as Davis's accomplice in committing the crimes. To prove that defendant acted as an accomplice, the State's case relied, in large part, on statements defendant made to the police and others and on witness testimony describing defendant's conduct immediately after the shooting.

---

[1] Before the trial began, the charge of purposeful or knowing murder was dismissed on the State's motion.

## A.

At about 2:00 a.m. on December 21, 2002, police officers responded to the sound of a gunshot at Marcy and Conover Streets in Freehold Borough. There they found Seth Mejia Hernandez lying in the street, mortally wounded. In his pants pocket was a wallet along with $80.00 and credit cards. On the ground nearby was a nine millimeter shell casing. An autopsy later revealed that Hernandez died from internal bleeding caused by a bullet that entered his left arm and pierced his lung. Before his death, Hernandez evidently had been heavily drinking; he had a blood alcohol content of .208 percent.[2]

Later that same morning, while canvassing the area near the scene of the crime, Freehold Borough Detective Brian Veprek questioned the then eighteen-year-old defendant, who denied knowing anything about Hernandez's killing. The next day, December 22, Detective Veprek and another detective took an eleven-page typewritten statement from defendant. In the statement, defendant claimed that at the time of the shooting both he and Greg Davis were asleep in separate beds in Issach Powell's bedroom at 45 Parker Street. Defendant maintained that earlier in the evening, he had been with Davis and Powell at the Freehold Raceway Mall.

On January 9, 2003, the police executed a search warrant at 45 Parker Street, where they found defendant, Davis, and Powell. The police discovered a black shaving bag containing a fully-loaded nine millimeter handgun with one round in the chamber on the roof of the house. Ballistics testing later determined that the bullet removed from Hernandez's body had been fired from that nine millimeter handgun. The three men were taken into custody.

Defendant was transported to the Monmouth County Prosecutor's Office where he waived his *Miranda*[3] rights and agreed to

---

[2] A person is guilty of driving under the influence of alcohol if his blood alcohol concentration is .08 percent or greater. *N.J.S.A.* 39:4–50(a).

[3] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

respond to questioning. Detective Veprek told defendant that the story he had given to the police about taking a taxi from 45 Parker Street to the Freehold Raceway Mall and back on the evening of December 20 and early morning of December 21 was not supported by the records of the taxi cab company. Next, Detective Veprek told defendant that the police had information placing him at the murder scene and had discovered a nine millimeter handgun at 45 Parker Street. The detective added falsely that defendant's fingerprints were found on the gun. Confronted with that evidence, defendant announced that "Greg Davis shot the Mexican."

Defendant explained that Hernandez, whom he described as "the Mexican," was "drunk" and "stumbling down Conover." As Hernandez turned onto Marcy, Davis followed him, with defendant walking not far behind Davis. According to defendant, "[Davis] was going to rip [Hernandez]." Davis then "tapped on [Hernandez's] shoulder and [Hernandez] swung at [Davis] and [Davis] shot him with the black 9." Defendant claimed that he observed the shooting from approximately six feet away. Immediately after the shooting, Davis and defendant ran to Powell's house on 45 Parker Street. Defendant telephoned Powell and told him that "it was going to be hot in Freehold."

Detective Veprek inquired how defendant knew that Davis "was going to rip the Mexican." Defendant replied, "I just knew." When the detective asked defendant "if he was going to rip [Hernandez] with [Davis]," defendant did not respond. When asked the same question again, defendant still gave no answer, "[h]e just looked down at the table." [4] Detective Veprek did not take a "formal statement" from defendant because he learned that

---

[4] We express no opinion whether Detective Veprek's testimony about defendant's failure to respond to his questions constituted an improper use of post-arrest silence. *See State v. Muhammad*, 182 *N.J.* 551, 558, 868 *A.2d* 302 (2005) ("[A] suspect's silence while in custody, under interrogation, or 'at or near' the time of his arrest cannot be used against him in a criminal trial.").

defendant's "mother had retained an attorney and that she requested that all questioning stop immediately."

Four days later, on January 14, in the presence of his attorney, defendant gave another statement to Detective Veprek. In his eighteen-page typewritten statement, defendant indicated that, before the shooting, he had been in the company of Davis and a friend, Zachary Butts. Defendant and Davis walked Butts to Butts's home at the corner of Conover and Marcy Streets. After Butts entered his house, Davis and defendant were standing on the corner when Hernandez came into sight. Defendant denied having any direct knowledge that Davis intended to rob Hernandez. He explained that, in his January 9 statement, when he said that he knew that Davis was "going to rip the Mexican," he merely assumed that was going to happen. Defendant stated that the term "rip" means rob. He insisted that he did not have a conversation with Davis about robbing Hernandez and that Davis never told him what he intended to do. Contrary to his January 9 statement, defendant now placed himself "15 to 16 feet" away from the shooting. After Davis shot Hernandez, defendant admitted that he ran with Davis from the scene. Defendant denied exchanging any words with Davis as the two ran from the scene.

According to defendant, he first saw Davis in possession of the "9 millimeter semi-automatic" that evening when Davis pulled the gun from his jacket pocket and shot Hernandez. Defendant had observed the gun several weeks before the shooting in the possession of both Davis and Powell. Defendant explained that he did not implicate Davis when initially questioned by the police because the "[c]ode of the street" commanded that he not turn in a friend. Defendant read and signed the typewritten statement.

In addition to reading defendant's statements to the jury, the State called several witnesses tying defendant to the crime scene. Two sisters, Jasmine and Shanelle Scales, testified that they were staying with their grandmother at 38 Parker Street at the time of the Hernandez killing. After a long night of partying, they were both drinking on their grandmother's porch around 2:00 a.m. on

December 21, 2002. They both claimed that they were intoxicated at the time and had no memory of the events of that evening. The prosecutor read to the jury the statements the two sisters gave to the police on January 9, 2003.[5] In her statement, Jasmine recalled that on December 21 at 2:00 a.m., she "heard a loud noise, which [she] thought was a firecracker," and then saw Davis and defendant "running down the street" toward the house of her cousin Ike Powell at 45 Parker Street. She heard defendant—whom she knew by the name of Irv Gotti—say "put it up, put it up." Shanelle's January 9 statement to the police was similar to that of her sister, except that she remembered defendant saying, "yo, god hurry up and put that shit up." The two sisters did not see either Davis or defendant with a gun.

Claudia Gastelum, who lived on 21 Parker Street, testified that in the early morning of December 21 she heard a popping sound and then opened her door and saw two men running down Parker Street. They stopped by the back of a car at 23 Parker, where one man said to the other, "hey, man, did you hear that? Did you see that?" After that brief interlude, the two men resumed running.

Last, Issach Powell testified that on December 21, 2002, both defendant and Davis were living at his home at 45 Parker Street.[6] At the time of the shooting, Powell was staying at his girlfriend's house. There, he received a telephone call from defendant who told him "Freehold was about to get hot." Sometime after 7:00 a.m., Powell returned to 45 Parker Street where defendant and Davis were sleeping in his bedroom. That evening, in Davis's presence, defendant gave Powell the following account about the shooting: defendant and Davis were "on the corner" when Davis

---

[5] Both also claimed to have been either high or inebriated when they gave their statements to the police.

[6] At the time of his testimony, Powell was incarcerated and awaiting trial on the unrelated offenses of first-degree robbery, aggravated assault, and weapons possession.

"ran down the guy [and] shot him"; Davis said to Hernandez, "give me the money"; and "as soon [as defendant] heard the shot he ran." Powell stated he and Davis had purchased the gun later identified as the weapon used to kill Hernandez. The gun was kept hidden "in the backyard of an abandoned house" on the block. A number of his friends, including defendant, had access to the weapon for "[p]rotection" against "older guys around [the] neighborhood." According to Powell, in a statement he gave the police, one evening he observed Davis and defendant with the gun.

## B.

In summation, the prosecutor argued that the jury could convict defendant of robbery and felony murder on either of two theories of accomplice liability. In one theory, the prosecutor contended that the evidence supported a finding that defendant aided and abetted Davis in a crime of opportunity against the inebriated and stumbling Hernandez. The prosecutor claimed that defendant knew that Davis was armed with a gun and about to rob Hernandez, that defendant shadowed Davis as Davis stalked Hernandez, and that defendant stood by and lent support as Davis attempted to commit a theft and then shot Hernandez. The prosecutor suggested that defendant's words to Davis as the two fled the scene—"yo, you got to put it up"—was a direction to discard the murder weapon and could be considered evidence that defendant was in on the crime from the beginning.

The prosecutor proffered an alternative theory of accomplice liability, telling the jury that defendant could be found guilty of robbery and felony murder even if defendant did not share Davis's purpose to rob Hernandez or participate in the shooting so long as he aided Davis in discarding the gun. Indeed, the prosecutor urged the jury to convict defendant of robbery and felony murder based solely on defendant's after-the-fact "put it up" remarks aimed at hindering Davis's apprehension. The prosecutor presented the jury with the following legal instruction:

[A] robbery is a continuous event. Okay. And it means that if you aid someone during the immediate flight from a robbery, you essentially have committed a robbery.

And I can give you an example of this. Let's say that you're driving your car and you pick up a hitchhiker. And the hitchhiker gets in your car and says, hey, I just did a robbery. Could you take me to the airport so that they don't catch me and you say, okay, I agree to that. Take the person to the airport. Is that hindering apprehension? No. That is a robbery right there. Now, you know what even though that's the law I'm telling you right now that example that's harsh. That's harsh. And if that's all I had in this case it would be tough to get up here and really argue hard. But that's not all I got in this case, ladies and gentlemen. I got his actions before, I got his actions during, and I got his actions in flight. That's what ties it altogether.

Defense counsel raised no objection to this argument. In addition, the trial court never advised the jury that the prosecutor's legal theory on after-the-fact accomplice liability was an impermissible basis on which to find defendant guilty of robbery and felony murder. The trial court simply read the jury the Model Jury Charges on accomplice liability and the substantive law that applied to the various counts in the indictment.

The jury convicted defendant of first-degree robbery, felony murder, third-degree unlawful possession of a weapon, and second-degree possession of a weapon for an unlawful purpose. The trial court sentenced defendant to a thirty-year prison term during which he would be ineligible for parole on the felony murder conviction and a five-year concurrent term on the unlawful-possession-of-a-weapon charge. The court merged the robbery and possession-of-a-weapon-for-an-unlawful-purpose convictions.

II.

The Appellate Division reversed defendant's convictions of felony murder, robbery, and possession of a weapon for an unlawful purpose, finding that the prosecutor in summation misstated the law on accomplice liability and that the trial court committed plain error by not correcting that misstatement when charging the jury. *State v. Whitaker*, 402 *N.J.Super.* 495, 515, 527, 955 *A.2d* 322 (App.Div.2008).[7] The Appellate Division concluded that defendant

---

[7] The Appellate Division affirmed the conviction of possession of a weapon without a permit. *Id.* at 527, 955 *A.2d* 322.

could be convicted of armed robbery and felony murder as an accomplice if he shared Davis's intent to commit the robbery, but that he could not be convicted of those crimes if his intent solely was to aid Davis in his escape after the robbery had been completed. *Ibid.* The panel parted ways with *State v. Baker,* 303 *N.J.Super.* 411, 697 *A.*2d 145 (App.Div.), *certif. denied,* 151 *N.J.* 470, 700 *A.*2d 882 (1997) and *State v. Williams,* 232 *N.J.Super.* 432, 557 *A.*2d 675 (App.Div.), *certif. denied,* 118 *N.J.* 208, 570 *A.*2d 967 (1989), to the extent those cases suggested that a defendant's after-the-fact assistance to a robber—without shared intent to commit the robbery—made him liable for robbery. *Id.* at 526, 955 *A.*2d 322.

According to the panel, the jury could have considered defendant's "put it up" instruction as one factor, among a number of factors, "in determining whether defendant shared the same intent as Davis to commit armed robbery." *Id.* at 527, 955 *A.*2d 322. The jury, however, could not "consider defendant's verbal direction as an independent basis of his guilt of robbery under the accomplice liability statute." *Ibid.* The panel found that the trial court should have given the jury a limiting instruction on the appropriate use of defendant's after-the-shooting verbal instruction to Davis. *Ibid.* "Because the jury was permitted to convict defendant of robbery ... solely on his verbal direction to Davis during flight," the panel ordered a new trial on the felony-murder, armed-robbery, and possession-of-a-weapon-for-an-unlawful-purpose charges.[8] *Ibid.*

We granted the State's petition for certification. *State v. Whitaker,* 197 *N.J.* 476, 963 *A.*2d 845 (2009). We also granted the Attorney General's motion to participate as *amicus curiae.*

---

[8] The Appellate Division addressed five other issues raised by defendant and found none merited a reversal of defendant's convictions. Defendant did not file a cross-petition challenging the Appellate Division's resolution of those issues. Therefore, in discussing the Appellate Division opinion, we have focused on the one issue on which certification was granted.

## III.

The State argues that even if defendant had no intent to aid Davis in the robbery and played no part in the victim's fatal shooting, he still could be found guilty of both robbery and felony murder because he told Davis to hide the gun as the two fled the scene. If the jury accepted that theory of accomplice liability presented by the prosecutor in summation, defendant may have been found guilty of robbery and felony murder despite the fact that he did not share the same intent as the principal who committed those crimes. That outcome, we find, would conflict with basic tenets of criminal responsibility set forth in the New Jersey Code of Criminal Justice.

We begin with a discussion of the law of accomplice liability.

## A.

Under the Code, an accomplice to a crime is legally responsible for "the conduct" of the person who actually commits the crime. *N.J.S.A.* 2C:2–6. In particular, *N.J.S.A.* 2C:2–6(c) provides that

[a] person is an accomplice of another person in the commission of an offense if:

(1) *With the purpose of promoting or facilitating the commission of the offense;* he

. . .

(b) Aids or agrees or attempts to aid such other person in planning or committing it[.]

[*N.J.S.A.* 2C:2–6 (emphasis added).]

The Code's accomplice liability statute requires that a defendant act with a purposeful state of mind in furtherance of the crime. *N.J.S.A.* 2C:2–6(c)(1) (requiring that defendant act "[w]ith the purpose of promoting or facilitating the commission of the offense"). Indeed, the New Jersey Criminal Law Commission, which was charged by the Legislature with modernizing New Jersey's criminal laws, emphasized that the scope of accomplice liability under the Code is limited to conduct animated with a purpose. 2 *The New Jersey Penal Code, Final Report of the New Jersey Criminal Law Revision Commission,* comment 6 on

§ 2C:2–6(c), at 58 (1971) (*Final Report*). That "purpose" is the equivalent of "specific intent." The Commission believed that with this heightened mens rea standard, "there is no risk of innocence." 2 *Final Report,* comment 7 on § 2C:2–6(c), at 59; *see also* Cannel, *New Jersey Criminal Code Annotated,* comment 7 on *N.J.S.A.* 2C:2–6(c), at 142 (2009) (citing cases holding that "defendant must have a purpose that someone else engage in the conduct that constitutes the particular crime charged"). "[M]ere knowledge, without more," does not make one an accomplice. 2 *Final Report,* comment 6 on § 2C:2–6(c), at 58. Strict liability is not a component of the Code's accomplice liability statute under *N.J.S.A.* 2C:2–6(c)(1)(b). *Cf.* 1 *Final Report,* at xii ("There must be an attempt to match the degree of the defendant's offense with his actual culpability.").

 Whether a defendant is a principal or an accomplice, the State must prove that he possessed the mental state necessary to commit the offense. *N.J.S.A.* 2C:2–2(a). Accordingly, the Code requires an individualized assessment of each defendant's criminal responsibility.[9] Thus, one defendant may be "guilty of a higher or lower degree of crime than the other, the degree of guilt depending entirely upon his own actions, intent and state of mind." *See State v. White,* 98 *N.J.* 122, 129, 484 *A.*2d 691 (1984) (quoting *State v. Fair,* 45 *N.J.* 77, 95, 211 *A.*2d 359 (1965)). An accomplice is only guilty of the *same* crime committed by the principal if he shares the *same* criminal state of mind as the principal. *See White, supra,* 98 *N.J.* at 129, 484 *A.*2d 691 ("For both the accomplice and his partner to be guilty, 'it is essential that they shared in the intent which is the crime's basic element.' " (quoting *Fair, supra,* 45 *N.J.* at 95, 211 *A.*2d 359)). On the other hand, an accomplice who does not share the same intent or purpose as the principal may be guilty of a lesser or different crime than the principal. *State v. Bielkiewicz,* 267 *N.J.Super.* 520, 528, 632 *A.*2d

---

[9] The essential goals of the Code include "differentiat[ing] on reasonable grounds between serious and minor offenses" and "defin[ing] adequately the act and mental state which constitute each offense." *N.J.S.A.* 2C:1–2(a)(5)–(6).

277 (App.Div.1993); *see also State v. Ingram*, 196 *N.J.* 23, 39, 951 *A.2d* 1000 (2008) (citing *Bielkiewicz* with approval); *State v. Savage*, 172 *N.J.* 374, 388, 799 *A.2d* 477 (2002) (same). For example, an accomplice who does not have a shared purpose "to commit a robbery *with a weapon*" is guilty of robbery—not armed robbery. *State v. Weeks*, 107 *N.J.* 396, 405, 526 *A.2d* 1077 (1987).

To be found guilty as an accomplice, a defendant must not only share the *same* intent as the principal who commits the crime, but also must "at least indirectly participate[ ] in the commission of the criminal act." *Bielkiewicz, supra*, 267 *N.J.Super.* at 528, 632 *A.2d* 277 (citing *Fair, supra*, 45 *N.J.* at 95, 211 *A.2d* 359); *N.J.S.A.* 2C:2–6(c)(1). Thus, for defendant to be guilty as an accomplice in the Hernandez robbery he must (1) have acted "[w]ith the *purpose* of promoting or facilitating" the robbery and (2) have "[a]id[ed] or agree[d] or attempt[ed] to aid [Davis] in planning or committing" the offense. *N.J.S.A.* 2C:2–6(c)(1)(b) (emphasis added).

We next examine the essential elements necessary to convict a defendant under the robbery statute.

### B.

*N.J.S.A.* 2C:15–1(a) defines the offense of robbery.

A person is guilty of robbery if, *in the course of committing a theft,* he:

(1) Inflicts bodily injury or uses force upon another; or

(2) Threatens another with or purposely puts him in fear of immediate bodily injury; or

(3) Commits or threatens immediately to commit any crime of the first or second degree.

An act shall be deemed to be included in the phrase "in the course of committing a theft" if it occurs in an attempt to commit theft or in immediate flight after the attempt or commission.

[(Emphasis added).]

Committing or attempting to commit a theft is a necessary element of the crime of robbery. *State v. Farrad*, 164 *N.J.* 247, 257, 753 *A.2d* 648 (2000). A person is guilty of theft "if he unlawfully takes, or exercises unlawful control over, movable

property of another with purpose to deprive him thereof."
*N.J.S.A.* 2C:20–3(a). Theft is classified as a "specific intent
crime," and because robbery is nothing more than an "aggravat-
ed" theft, it too is a "specific intent crime." *State v. Lopez,* 187
*N.J.* 91, 98, 900 *A.2d* 779 (2006). To be clear, "[a]bsent proof of
the specific intent to steal, a defendant cannot be found guilty of
robbery." *Ibid.* (quotation and citation omitted).

The robbery statute also "requires that the threats or
violence be carried out in furtherance of the intention to commit a
theft." [10] *Id.* at 101, 900 *A.2d* 779. The assaultive or intimidating
conduct necessary to elevate theft to robbery somehow must be
related to the theft itself. *Id.* at 98, 900 *A.2d* 779. If such
assaultive or intimidating conduct occurs "in immediate flight after
the attempt or commission" of the theft, then what was a theft
becomes a robbery. *N.J.S.A.* 2C:15–1(a); *State v. Mirault,* 92
*N.J.* 492, 498, 457 *A.2d* 455 (1983) (noting that theft turns into
robbery when defendant injures or threatens " 'another' before,
during, and after a theft"). The robbery statute therefore gives a
powerful disincentive to defendants from using or threatening
force while in flight from a theft. The terms "in the immediate
flight after the attempt or commission [of a theft]" and "in the
course of committing a theft" extend the period of time for
elevating a theft to a robbery, provided certain acts occur within
that time period.[11] 2 *Final Report,* comment 2 on 2C:19–1,[12] at

---

[10] The State must prove that a defendant acted at least knowingly to satisfy the
injury/force component of the robbery statute. *See State v. Sewell,* 127 *N.J.* 133,
144–49, 603 *A.2d* 21 (1992) (finding Code's gap-filling provision as well as
legislative intent requires, at minimum, State to prove defendant acted with
knowledge when causing injury or using force in committing robbery).

[11] The Appellate Division in this case concluded that the only "acts" that could
elevate a theft to robbery were those defined in *N.J.S.A.* 2C:15–1(a)(1), (2), and
(3). *Whitaker, supra,* 402 *N.J.Super.* at 518–27, 955 *A.2d* 322. Because the
fundamental issue before us is whether defendant can be found guilty of robbery
even if he did not share Davis's criminal intent at or before the occurrence of the
attempted theft and shooting of the victim, we express no opinion about the

214 (explaining "in the course of committing a theft" to include behavior "after the theft has been accomplished"). Those terms do not dilute the State's obligation of proving that the accomplice shared the principal's intent to commit the theft.

■ Significantly, "the sequence of events is critical; the intention to steal must precede or be coterminous with the use of force." *State v. Lopez, supra,* 187 *N.J.* at 101, 900 *A.*2d 779. For example, in *Lopez,* we held that a person who committed manslaughter would not be guilty of robbery if his intent to steal from the decedent's body was formed after the killing. 187 *N.J.* at 101, 900 *A.*2d 779 (rejecting notion of "afterthought robbery" as crime under Code of Criminal Justice).

In this case, the robbery is the predicate crime for felony murder. A person commits felony murder when he "causes the death of a person other than one of the participants" while "engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery [and other enumerated offenses.]" *N.J.S.A.* 2C:11–3(a)(3).

We now apply the facts of this case to the principles of accomplice liability and the crime of robbery.

## IV.

### A.

■ Defendant is an accomplice to the robbery committed by Davis only if he had the "purpose of promoting or facilitating" the theft, that is, if he shared Davis's intent to steal from Hernandez. *N.J.S.A.* 2C:2–6(c)(1). If the State could prove that defendant, acting as an accomplice, intended to aid or abet Davis in the theft

---

Appellate Division's discourse on what "acts" elevate a theft to robbery under *N.J.S.A.* 2C:15–1(a)(1)–(3).

[12] The robbery statute was renumbered from Chapter 19 to Chapter 15 in 1979. See Cannel, *supra,* comment 1 on *N.J.S.A.* 2C:15–1, at 421.

and knew that Davis was armed with a gun, then defendant too would be guilty of armed robbery and felony murder. *See, e.g., White, supra,* 98 *N.J.* at 130, 484 *A.*2d 691 ("The accomplice has committed the same crime as the individual who possessed or used the gun if the accomplice had the purpose to promote or facilitate that crime, namely, robbery with the use of a firearm."). However, if defendant lacked the specific intent to commit the theft but instead intended only to assist in hindering Davis's apprehension, defendant would be guilty only of the crime of hindering.[13]

In the present case, the act of violence—Davis's shooting of Hernandez—occurred contemporaneously with Davis's attempt to steal money from Hernandez.[14] For Davis, attempted theft was elevated to armed robbery and felony murder by brandishing a gun and shooting the victim. No threats or acts of violence were committed during the flight from the scene. Accordingly, in this case, after Davis fatally shot Hernandez, the first-degree robbery had occurred. Unless defendant intended to

---

[13] *N.J.S.A.* 2C:29–3 defines the crime of hindering apprehension. The statute provides, in relevant part:

> a. A person commits an offense if, with purpose to hinder the detention, apprehension, investigation, prosecution, conviction or punishment of another for an offense or violation of Title 39 of the Revised Statutes or a violation of chapter 33A of Title 17 of the Revised Statutes he:
>
> . . . .
>
> (3) Suppresses, by way of concealment or destruction, any evidence of the crime, or tampers with a witness, informant, document or other source of information, regardless of its admissibility in evidence, which might aid in the discovery or apprehension of such person or in the lodging of a charge against him[.]
>
> [*N.J.S.A.* 2C:29–3.]

[14] This is not a case involving theft from a person after which, in flight, Davis or defendant injured or threatened violence to a person, elevating a theft to a robbery. Neither Davis nor defendant engaged in acts of violence or threats as they ran from the scene, activity that would fall within the language, "in the course of committing a theft." *See N.J.S.A.* 2C:15–1(a). Had defendant not intended to aid Davis in committing a theft, but engaged in assaultive behavior as the two fled the scene, then defendant would be guilty of the crime of assault and hindering, but not robbery and felony murder.

promote or facilitate the theft committed by Davis before or at the time of its occurrence, defendant is not a culpable party to the robbery. The reasoning in *Lopez, supra,* in which we rejected "afterthought" robbery, applies with equal force to the facts before us—defendant cannot be held liable as an accomplice to a robbery solely based on his conduct *after* Davis had already robbed and fatally wounded the victim.

Nevertheless, the State argues that a person who assists the immediate flight of a robber, per se, is an accomplice to the robbery. The appellate panel in this case rejected that sweeping interpretation of our accomplice liability and robbery statutes, which finds its genesis in *State v. Baker, supra,* 303 *N.J.Super.* 411, 697 *A.2d* 145 and *State v. Williams, supra,* 232 *N.J.Super.* 432, 557 *A.2d* 675. We do so as well. According to the panels in *Baker* and *Williams,* a clueless getaway driver—a defendant who did not know that his cohorts were armed, intended to commit a robbery, and indeed carried out a robbery—would be guilty as an accomplice based on what he learned after-the-fact. *Baker, supra,* 303 *N.J.Super.* at 416, 697 *A.2d* 145; *Williams, supra,* 232 *N.J.Super.* at 436–37, 557 *A.2d* 675. Under this rationale, a person who aids the escape of a robber is an accomplice to robbery even if he did not have a purpose to promote or facilitate the theft when it occurred. That result is at odds with the language of our accomplice liability and robbery statutes and the precedents of this Court. As stated earlier, theft is an essential element of robbery. The driver of a vehicle spiriting away the culprits who committed a robbery is not retroactively guilty of that crime if he had no intent to participate in the theft at or before the time of its occurrence. The driver, however, would be guilty of hindering their apprehension if—after-the-fact—he became aware of the crime they had committed and aided in their getaway.[15] The

---

[15] The Code distinguishes between a defendant aiding the commission of a crime before or while it occurs and a defendant giving assistance to an offender after he commits the crime. This distinction was recognized in the common law by the terms accessory to a crime and accessory after the fact. At common law,

Code does not support holding a defendant strictly liable for a crime in which he did not share the same criminal intent as his confederates.

To summarize, to establish accomplice liability in a robbery case, the Code requires that the State prove that an accomplice shared the principal's intent to commit the theft before or at the time the theft or attempted theft was committed.

## B.

We find that there was sufficient direct and circumstantial evidence in the record from which a properly charged jury could have found defendant guilty as an accomplice to the robbery and felony murder of Hernandez. Defendant and Davis were together on a street corner when the intoxicated and stumbling Hernandez came into their view. Defendant followed Davis as Davis stalked Hernandez. Davis was armed with a nine millimeter handgun that previously had been in defendant's possession. Defendant told the police in one of his statements that he knew that Davis intended to rob Hernandez. In addition, defendant stood a short distance away when Davis tapped Hernandez on the shoulder. The inebriated Hernandez took a swing at Davis, who then fatally shot him. Then, both Davis and defendant ran from the scene, with defendant telling Davis, "put it up, put it up." The jury could fairly have drawn an inference that defendant had instructed Davis to discard the weapon on the roof of a house. From all those facts, the jury was free to conclude that defendant had "the

accessories after the fact were liable if, "knowing that a felony has been committed by another, ... [they] assist[ed] the felon, or in any manner aid[ed] him or her to escape arrest or punishment." 21 Am.Jur.2d Criminal Law § 170, p. 281 (2008). Under the common law, an accessory after the fact was subject to the same punishment as the principal. William Blackstone, 4 Commentaries *39. The Code continued New Jersey's prior statutory approach, mitigating the harsh result of the ancient common law by creating the separate and less culpable crime of hindering apprehension. 2 Final Report, comment 1 on § 2C:29–3, at 283; State v. Sullivan, 77 N.J.Super. 81, 89–90, 185 A.2d 410 (App.Div.1962).

purpose of promoting or facilitating" a theft by aiding Davis as a lookout or intimidating presence, that he knew that Davis was armed with a gun, and that defendant's role in discarding the gun was evidence that he was an accomplice from the outset.

On the other hand, the jury could not convict defendant if it did not believe beyond a reasonable doubt that defendant had the intent to participate in a theft from Hernandez and did not aid Davis in shooting Hernandez. If all the jury believed was that defendant aided Davis in concealing the weapon after Davis committed the robbery, then defendant could not be found guilty of robbery and felony murder. That brings us to the prosecutor's summation.

The prosecutor argued to the jury that defendant's statement, "put it up, put it up," was an instruction to conceal the murder weapon and that, standing alone, without any additional evidence, made defendant an accomplice to the theft, armed robbery, and felony murder of Hernandez. That explanation of the scope of accomplice liability was clearly erroneous. Under the prosecutor's alternative, accomplice-liability scenario, defendant would be guilty of hindering apprehension, if properly charged with that offense.

Although no objection was raised to the prosecutor's legal theory, if accepted and acted on by the jury, it would have led to defendant's wrongful conviction of robbery and felony murder. The trial court had the obligation not only to give the model charges on accomplice liability and the substantive crimes to the jury, but also to dispel the tantalizingly simple but mistaken legal theory the prosecutor offered in summation to the jury. The failure to do so constituted plain error. *R.* 2:10–2 (instructing appellate courts not to disregard error "clearly capable of producing an unjust result" even when not brought to attention of court by counsel).

We do not suggest that the prosecutor acted in bad faith. There were Appellate Division opinions that supported his legal

theory. That also may explain the trial court's failure to intercede and correct the prosecutor. Nevertheless, this Court is the final arbiter of the meaning of the Code. Because we conclude that it is impossible to determine whether the jury convicted defendant of robbery and felony murder based on an impermissible legal theory, we are constrained to reverse his convictions of armed robbery and felony murder.[16] *See, e.g., State v. Samuels,* 189 *N.J.* 236, 255, 914 *A.*2d 1250 (2007) (reversing conviction because jury was charged both correctly and mistakenly on applicable law, and "there [was] no assurance that the jurors understood and applied the correct legal principles in reaching their verdict").

We also agree with the Appellate Division that defendant's conviction of possession of a weapon for an unlawful purpose must be reversed as well. *State v. Whitaker, supra,* 402 *N.J.Super.* at 527, 955 *A.*2d 322. *N.J.S.A.* 2C:39-4(a)(1) provides that "[a]ny person who has in his possession any firearm with a purpose to use it unlawfully against the person or property of another is guilty of a crime of the second degree." The prosecutor argued and the trial court explained to the jury that the unlawful purpose underlying this weapons-offense charge was the robbery. If the jury wrongly convicted defendant of robbery based on an improper understanding of accomplice liability, then, for the same reason, the jury may have mistakenly convicted defendant of this weapons offense. That is, if defendant did not intend to commit or participate in the robbery, his possession of the weapon would not have been for the unlawful purpose of committing a robbery.

## V.

For the reasons discussed, we affirm the judgment of the Appellate Division, which reversed defendant's convictions of felo-

---

[16] Because defendant's felony-murder conviction was predicated on his robbery conviction and because the robbery conviction is infirm, the robbery and felony-murder convictions both must be reversed. *See, e.g., State v. Grey,* 147 *N.J.* 4, 16, 685 *A.*2d 923 (1996); *N.J.S.A.* 2C:11–3(a)(3).

ny murder, first-degree robbery, and second-degree possession of a weapon for an unlawful purpose. We remand to the trial court for a new trial and proceedings consistent with this opinion.

*For affirmance and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.