NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0135-16T4

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

TERRANCE J. PATTERSON,

 Defendant-Appellant.

 Submitted September 26, 2017 – Decided October 10, 2017

 Before Judges Carroll, Leone and Mawla.

 On appeal from the Superior Court of New
 Jersey, Law Division, Burlington County,
 Indictment No. 14-08-0830.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Stefan Van Jura, Deputy Public
 Defender, of counsel and on the brief).

 Christopher S. Porrino, Attorney General,
 attorney for respondent (Arielle E. Katz,
 Deputy Attorney General, of counsel and on the
 brief).

 Appellant filed a pro se supplemental brief.

PER CURIAM

 Defendant Terrance J. Patterson was charged in Burlington

County Indictment No. 14-08-0830 with first-degree murder,
N.J.S.A. 2C:11-3a(1) and (2) (Count One); first-degree felony

murder while engaging in robbery, N.J.S.A. 2C:11-3a(3) (Count Two)

and kidnapping, N.J.S.A. 2C:11-3a(3) (Count Three); first-degree

kidnapping, N.J.S.A. 2C:13-1b(1) and (2) (Count Four); and

first-degree robbery, N.J.S.A. 2C:15-1a(1) and (2) (Count Five).

Prior to trial, defendant moved unsuccessfully to suppress

evidence obtained pursuant to three communications data warrants

(CDWs), to exclude the statement he gave to police, and to bar the

admission of telephone conversations recorded while he was an

inmate at the Burlington County Jail.

 Defendant was tried before a jury on various dates between

May 17, 2016 and June 1, 2016. The jury convicted defendant on

Counts One, Two, Three, and Four, and found him guilty of

second-degree robbery as a lesser-included offense of first-degree

robbery on Count Five upon determining that the State did not

prove he committed the robbery while armed with a deadly weapon.

 On July 12, 2016, the court granted the State's request to

sentence defendant on Count One to life imprisonment without the

possibility of parole pursuant to the "Three Strikes Law," N.J.S.A.

2C:43-7.1a. Counts Two and Three merged with Count One. The

court imposed a thirty-year prison term on Count Four, and a

twenty-year term on Count Five, each subject to an eighty-five

percent parole ineligibility period pursuant to the No Early

 2 A-0135-16T4
Release Act, N.J.S.A. 2C:43-7.2, and concurrent to the sentence

imposed on Count One. The present appeal followed.

 In his counseled brief, defendant raises the following issues

for our consideration:

 POINT I

 IT WAS REVERSIBLE ERROR FOR THE JUDGE TO FAIL
 TO INSTRUCT THE JURY ON ACCOMPLICE LIABILITY,
 ESPECIALLY IN LIGHT OF THE JURY'S QUESTION
 SIGNALING ITS CONFUSION. (Not Raised Below).

 POINT II

 THE CONVICTIONS FOR ROBBERY AND FELONY MURDER
 PREDICATED UPON ROBBERY MUST BE REVERSED
 BECAUSE THE JUDGE NEGLECTED TO CHARGE THE JURY
 ON AN ESSENTIAL ELEMENT OF THOSE OFFENSES,
 NAMELY, THEFT. (Not Raised Below).

 POINT III

 THE IMPOSITION OF LIFE WITHOUT PAROLE PURSUANT
 TO THE "THREE STRIKES LAW," N.J.S.A.
 2C:43-7.1, WAS UNLAWFUL BECAUSE IT WAS BASED
 ON THE JUDGE'S FALSE BELIEF THAT DEFENDANT HAD
 COMMITTED TWO PRIOR FIRST-DEGREE ROBBERIES.
 (Not Raised Below).

 The following additional points are raised in defendant's pro

se supplemental brief:

 POINT I

 THE AFFIDAVITS [ON] WHICH THE COMMUNICATIONS
 DATA WARRANTS WERE BASED [] FAILED TO
 ESTABLISH[] PROBABLE CAUSE THAT EVIDENCE OF A
 CRIME WOULD BE FOUND THEREIN.

 3 A-0135-16T4
 POINT II

 THE COMMUNICATIONS DATA WARRANT AUTHORIZING
 THE SEIZURE OF DEFENDANT'S CELL PHONE RECORDS
 WAS PROCURED BY WAY OF WILLFULLY FALSE
 STATEMENTS IN [DETECTIVE] FENKEL'S SEARCH
 WARRANT APPLICATION.

 POINT III

 THE JUDGE BASED HIS DECISION ON A
 MISINTERPRETATION OF THE FACTS AND ERRONEOUSLY
 ALLOWED THE [CDWs] INTO EVIDENCE AND NOT
 ALLOWING [] DEFENDANT A FAIR TRIAL.

 POINT IV

 THE JUDGE ERRED IN NOT SUPPRESSING THE
 DEFENDANT'S ILLEGALLY OBTAINED JAIL HOUSE
 CALLS, WHICH PROVIDED INADMISSIBLE [HEARSAY]
 AND ALSO DID NOT DEPICT [] DEFENDANT AS THE
 SPEAKER.

 POINT V

 THE STATEMENTS OF LORAIN HAWKINS SHOULD BE
 EXCLUDED AS INADMISSIBLE [HEARSAY].

 For the reasons that follow, we affirm defendant's

convictions. However, we reverse the sentences imposed on Counts

One and Five and remand for resentencing on those counts.

 I.

 We derive the following facts from the record developed at

trial. At approximately 8:30 a.m. on October 7, 2013, a woman's

lifeless body was found in a wooded area near Route 206 in

Tabernacle. Police responded and discovered a casino player's

card in the victim's pocket bearing the name Lisa Armstrong. The

 4 A-0135-16T4
officers subsequently confirmed the identity of the victim as Lisa

T. Armstrong of Trenton.

 Police obtained a CDW authorizing the production of

Armstrong's cell phone records. An analysis of Armstrong's call

history revealed she was in contact with a phone number belonging

to Lorain Hawkins multiple times between 3:30 a.m. and 4:14 a.m.

on October 7, 2013. Hawkins's phone records, obtained following

issuance of a second CDW, showed Hawkins was also frequently in

contact with another phone number. After a third CDW was issued,

police ascertained that number belonged to defendant. Notably,

the phone records revealed Hawkins sent defendant a text message

at 4:17 a.m. stating, "The door is open, come in[.]"

 Detective Fred Goelz of the New Jersey State Police (NJSP)

testified he reviewed surveillance footage from two businesses

near Armstrong's home, which defendant admitted visiting in the

early morning hours of October 7, 2013. Goelz testified that on

the video he observed two people walking toward Armstrong's house

between 4:14 a.m. and 4:18 a.m. He further observed three people

leave the area between 4:32 a.m. and 4:34 a.m. and enter a parked

car. One of these individuals appeared to be hunched over with

her hands bound.

 Armstrong's daughter, Jahyda Bennett, viewed the video and

identified her mother as the person hunched over and bound, based

 5 A-0135-16T4
on her "body mass [and] the way she walked." However, the quality

of the surveillance video was poor and neither Bennett nor any

other witness could identify the other persons in the video.

 Bennett further testified she spoke with Armstrong at

approximately 7:45 p.m. on October 6. There was nothing abnormal

about the conversation, and her mother gave no indication she

planned to go out that evening. Bennett also knew her mother had

been at a casino with Hawkins on October 4, as Armstrong had spoken

to her about it. According to Bennett, Armstrong and Hawkins had

met in Narcotics Anonymous and became close friends.

 Bennett attempted to reach her mother on October 7, after she

bought some groceries that Armstrong requested. Bennett called

her mother approximately twenty times and became worried when she

did not answer because Armstrong "never has her phone off" and

"always answers for [her]." Bennett then went to her mother's

house, where NJSP officers were already present. Bennett noticed,

among other things, that multiple items were missing including

cash, an iPad, camera, and jewelry worth more than $10,000.

 Hawkins passed away from natural causes before defendant's

trial. Her widower, Kerry Mitchell, testified Hawkins left their

home around midnight on October 6, stating she was going to the

casino. Mitchell woke up around 5:30 a.m. the next day and noticed

Hawkins and her car were gone. He did not see Hawkins until he

 6 A-0135-16T4
returned home from work during the afternoon of October 7, and did

not learn of Armstrong's disappearance until October 8.

 Mitchell testified he did not know defendant, but was

"familiar" with him because he was a relative of someone that

Mitchell and Hawkins previously had a sexual relationship with.

Mitchell also knew defendant and Hawkins were involved in a sexual

relationship.

 On October 11, 2013, Hawkins and defendant arrived at

Mitchell's home with a letter defendant wrote in which he confessed

to Armstrong's murder and exonerated Hawkins of any

responsibility. They asked Mitchell to transcribe the letter due

to defendant's poor penmanship and spelling. Mitchell testified

he agreed to write the letter because he was frightened. He did

not insert any of his own words, but was told by defendant and

Hawkins what to write. Defendant, Hawkins, and Mitchell all signed

the letter and Mitchell turned it over to the NJSP that day.

 On October 12, 2013, defendant surrendered to police and gave

a video-recorded statement. During the interview, defendant read

the letter, which stated in pertinent part:

 To whom it may concern. My name is
 TERRANCE J. PATTERSON. I am writing this
 statement with a sound mind. I am not under
 the influence of drugs, alcohol, nor am I
 under the influence of any prescription
 medications.

 7 A-0135-16T4
 . . . .

 [On the morning of October 7, 2013,] I
asked if [Armstrong] would take me home. She
said yeah because she wanted to go out and get
some coffee and cigarettes. So we headed
towards (INAUDIBLE). Her pocketbook was
sitting by the gearshift. I reached for the
volume and her pocketbook fell over. She
started gathering her things and putting them
back in her pocketbook and noticed her money
was . . . not there. She immediately accused
me of stealing her money. I asked why would
I want to steal . . . her money. And she
said, "[s]omebody had to steal it and you are
the only one in the car." She started calling
me all types of names, screaming I'm a pussy
and she was going to get her sons to fuck me
up. I kept trying to explain that I did not
have the money. This escalated and it did not
appear as if she would calm down. I said,
"[b]itch, just ride around, [Hawkins] will
take me home." She started (INAUDIBLE) and
still cursing and yelling. I slammed the car
in park and was reaching for the keys and
noticed she had pulled a gun. I saw how she
handled the gun and had time to snatch the
gun. I got out of the car not knowing what
she would do next. At this point, I was
furious. I opened the trunk, not knowing what
I was looking for. There was a black bag
(INAUDIBLE) and there was also duct tape. I
put the bag on the ground and took the duct
tape out. I walked to the side of the car
(INAUDIBLE) she was still running her mouth.
I snatched the door open and told her, "[s]hut
the fuck up and get out of the car." I
yank[ed] her out of the car and told her to
turn the fuck around. I started taping her
hands . . . and threw her in the back seat.
I got in the driver's seat and began to drive.
Her money was in between the driver's seat and
I threw it in the back with her and said,
"[h]ere's your fucking money." I kept driving
and she kept yelling and cussing. I drove

 8 A-0135-16T4
 until I couldn't drive anymore and pulled over
 by some woods. I got out and went to the back
 of it and threw her in the passenger's side
 and pulled her out. (INAUDIBLE) the woods and
 she kept calling me pussy and other names. I
 threw her on the ground, pointed the gun and
 I shot two times. It was dark and I had no
 idea where it hit her at. I jumped back in
 the car and drove back to her house. I took
 the money and the cell phone and left her keys
 and pocketbook then I left. In no[] way,
 shape, or form was this[] a robbery
 (INAUDIBLE). This was not a set-up, actually
 things moved so fast that I snapped. I used
 her phone to text [Hawkins] and other people
 in her phone. I made a call to the insurance
 company and [Hawkins] and maybe someone else.
 I text[ed] or called [Hawkins] and asked if
 she could bring my stereo and [a] bag of
 clothes. I put the stuff in the house. She
 parked on (INAUDIBLE) in case her husband
 drove through. I want . . . it to be known
 that I liked [Armstrong] a lot. I just felt
 as though she was trying to rob me. Many
 people have been accused and I want to say I
 am very sorry. I have wanted to turn myself
 in since Tuesday. I just couldn't take it
 anymore. There were no other people involved
 although it would be better for me to have co-
 defendants to share my stress with but there
 are none. I got my driver's license, I got a
 job (INAUDIBLE) my own apartment. I did not
 plan this and never wanted it to happen.

Defendant then acknowledged his signature, along with those of

Hawkins and Mitchell, at the bottom of the letter.

 After detectives questioned certain inconsistencies in

defendant's version of events, the following colloquy ensued:

 Q: It's [Hawkins's] car man. It's not
 [Armstrong's] car. [Armstrong's] car doesn't
 move. Give me that. It's [Hawkins's] car.

 9 A-0135-16T4
 A: I want to state for the record I did
not kill [Armstrong].

 Q: OK. So now you didn't kill her?

 A: Uh huh (negative response).

 Q: Then who did?

 A: Not for me to tell you.

 Q: Well if you didn't kill her, why would
you sit here for the last few hours and tell
us you did?

 Q: So why'd you tell this whole story
then?

 A: What story?

 Q: The whole thing, the letter you wrote,
or you had someone write for you. Why is, why
is all that?

 A: Most, that letter, most of that letter
all there is true except for the part of me
killing her.

 Q: Well you're going to have to help us
out. You're going to have to fill in the
blanks here for us.

 Q: So, so the whole letter's true except
you didn't kill her, that's how you're
changing the story now?

 A: Uh huh (affirmative response).

 Q: Now we're going backwards, huh?

 A: No you know I just want to stick to
you know what I wrote.

 Q: So you're sticking with what you
wrote?

 10 A-0135-16T4
 A: Yeah.

 Q: Which is that you killed her?

 A: I didn't kill her.

 Q: So what you wrote is a lie?

 A: Why don't y'all stick to y'all facts.
 Y'all facts going to outweigh mine anyway.

 Q: What's that?

 A: I said y'all facts going to outweigh
 mine anyway.

 At trial, the State introduced three audio recordings of

phone calls between defendant and Hawkins while defendant was

lodged in the Burlington County Jail. In the calls, defendant

assured Hawkins he had not implicated her to the police, and

"explained to them on numerous times that you . . . had nothing

to do with this nor [were] you involved in this nor did you play

any part of this." For her part, Hawkins stated: "I did not

witness no murder, I did not set up no murder[.]" She lamented

"[t]hey just don't want to accept I had absolutely nothing to do

with this."

 The State also presented cell tower information designed to

link defendant to the murder scene. NJSP Detective Joseph Itri

testified the phone records showed that a call from Armstrong's

cell phone was picked up on a tower in Mount Holly at 4:58 a.m.

on October 7, 2013. Mount Holly is located about half way between

 11 A-0135-16T4
Tabernacle and Trenton, along the route defendant would have driven

at that time according to his written confession. The information

was also consistent with defendant's admission that he used

Armstrong's phone to make multiple calls following her murder.

 II.

 A.

 Defendant first argues the trial court erred by failing to

sua sponte instruct the jury on accomplice liability. He contends

the absence of the accomplice liability charge left the jury unable

to consider lesser-included offenses pursuant to State v.

Bielkiewicz, 267 N.J. Super. 520, 527 (App. Div. 1993). He further

contends the jury thus had no guidance to understand the elements

of accomplice liability when it potentially used that theory to

convict him. Because defendant did not object to the charge, we

consider it under the plain error standard, Rule 1:7-2, and

disregard any error or omission by the trial court "unless it is

of such a nature as to have been clearly capable of producing an

unjust result." R. 2:10-2. "To warrant reversal[,] . . . an

error at trial must be sufficient to raise 'a reasonable doubt

. . . as to whether the error led the jury to a result it otherwise

might not have reached.'" State v. Funderburg, 225 N.J. 66, 79

(2016) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)).

 N.J.S.A. 2C:2-6 provides in pertinent part:

 12 A-0135-16T4
 c. A person is an accomplice of another person
 in the commission of an offense if:

 (1) With the purpose of promoting or
 facilitating the commission of the offense;
 he

 (a) Solicits such other person to commit
 it; [or]

 (b) Aids or agrees or attempts to aid
 such other person in planning or committing
 it[.]

 When the State proceeds under a theory of accomplice

liability, the "court is obligated to provide the jury with

accurate and understandable jury instructions regarding accomplice

liability even without a request by defense counsel." Bielkiewicz,

supra, 267 N.J. Super. at 527. In such a case, a "jury must be

instructed that defendant 'shared in the intent which is the

crime's basic element, and at least indirectly participated in the

commission of the criminal act.'" State v. Oliver, 316 N.J. Super.

592, 596 (App. Div. 1998) (quoting Bielkiewicz, supra, 267 N.J.

Super. at 528); see also State v. Whitaker, 200 N.J. 444, 458

(2009) ("An accomplice is only guilty of the same crime committed

by the principal if he shares the same criminal state of mind as

the principal.") (emphasis omitted).

 "[J]ury instructions on accomplice liability must include an

instruction that a defendant can be found guilty as an accomplice

of a lesser included offense even though the principal is found

 13 A-0135-16T4
guilty of the more serious offense." State v. Norman, 151 N.J.

5, 37 (1997). Thus, "when an alleged accomplice is charged with

a different degree offense than the principal or lesser included

offenses are submitted to the jury, the court has an obligation

to 'carefully impart[] to the jury the distinctions between the

specific intent required for the grades of the offense.'"

Bielkiewicz, supra, 267 N.J. Super. at 528 (alteration in original)

(quoting State v. Weeks, 107 N.J. 396, 410 (1987)).

 In the absence of a request, the obligation to provide an

accomplice liability instruction only arises "in situations where

the evidence will support a conviction based on the theory that a

defendant acted as an accomplice" and not a principal in the

commission of a crime. State v. Crumb, 307 N.J. Super. 204, 221

(App. Div. 1997); see also State v. Rue, 296 N.J. Super. 108, 115

(App. Div. 1996) (finding no accomplice liability charge was

warranted where the prosecution was based on "defendant's

culpability . . . as a principal" and defendant maintained he "was

not guilty of a crime at all"), certif. denied, 148 N.J. 463

(1997). Thus, "[w]hen the State's theory of the case only accuses

the defendant of being a principal, and a defendant argues that

he was not involved in the crime at all, then the judge is not

obligated to instruct on accomplice liability." State v. Maloney,

216 N.J. 91, 106 (2013).

 14 A-0135-16T4
 In the present case, the judge did not commit plain error by

failing to sua sponte instruct the jury on accomplice liability.

"Further, even if defendant had requested such a charge, the

accomplice liability instruction would not have been warranted

because it was not grounded in a rational basis in the trial

evidence." Maloney, supra, 216 N.J. at 108. The State contended

that, while Hawkins may have had some complicity in the matter,

it was defendant alone who shot Armstrong. Defendant was charged

in the indictment as a principal in the murder, kidnapping, and

robbery, and the State presented proofs consistent with that

theory. Defendant confessed in his letter, witnessed by Mitchell,

that he alone was the one who shot and killed Armstrong. In

defendant's jailhouse calls with Hawkins, defendant reiterated

that Hawkins had no involvement with the murder, and no evidence

was introduced to the contrary. As the Court concluded in Maloney,

"none of the evidence presented by the State could support a jury

finding that defendant was liable as an accomplice rather than as

a principal." Id. at 109. See also Norman, supra, 151 N.J. at

38 (stating that an accomplice liability charge was not warranted

because the evidence did not permit the jury "to conclude that

defendants fired the shots or aided in the firing of the shots

with anything less than homicide in mind").

 15 A-0135-16T4
 Moreover, at trial, the defense was that defendant was not

involved at all in the murder. Further, there is no evidence that

defendant was any less complicit in the robbery and kidnapping

than Hawkins, or that any lesser included offense would have been

justified even if an accomplice liability charge had been given.

Defendant's remaining arguments on this issue lack sufficient

merit to warrant discussion. R. 2:11-3(e)(2).

 B.

 Defendant next argues that his convictions for robbery and

felony murder predicated on robbery must be reversed because the

court failed to instruct the jury on the essential element of

theft. Because defendant did not object to this omission at trial,

we again review for plain error. Funderburg, supra, 225 N.J. at

79.

 A person is guilty of robbery if, in the course of committing

a theft, attempted theft, or in the immediate flight thereafter,

he or she: (1) inflicts bodily injury or uses force upon another;

(2) threatens another with bodily injury or purposefully places

that person in fear of immediate bodily injury; or (3) commits or

threatens to immediately commit any crime of the first or second

degree. N.J.S.A. 2C:15-11(a); State v. Carlos, 187 N.J. Super.

406, 412 (App. Div. 1982), certif. denied, 93 N.J. 297 (1983).

Accordingly, commission of theft or attempted theft is an element

 16 A-0135-16T4
of the crime of robbery. Whitaker, supra, 200 N.J. at 459. Under

our Criminal Code, "[a] person is guilty of theft if he unlawfully

takes, or exercises unlawful control over, movable property of

another with purpose to deprive him thereof." N.J.S.A. 2C:20-3a.

 Defendant correctly points out that the model jury charge for

robbery1 includes the statutory definition of theft. He contends

the court's failure to incorporate the definition of theft into

the robbery charge was not harmless because "the jury was presented

with evidence from which it could have found that [defendant] did

not participate in the theft." We are not persuaded.

 The court gave a detailed instruction to the jury on robbery,

stating:

 [Defendant] is charged in the fifth count of
 the indictment with robbery, it being alleged
 that on October 7, 2013 he did, in the course
 of committing a theft, inflict bodily injury
 or use force upon Lisa Armstrong, or did
 threaten her with or put her in immediate fear
 of bodily injury while armed with a deadly
 weapon.

 The governing statute provides: A person is
 guilty of robbery if, in the course of
 committing a theft, he knowingly inflicts
 bodily injury, or uses force upon another or
 does knowingly threaten another with or
 purposely put another in fear of immediate
 bodily injury.

1
 See Model Jury Charge (Criminal), Robbery in the First Degree
(2012).

 17 A-0135-16T4
The [c]ourt has previously defined the terms
purposely and knowingly and deadly weapon, and
they have the same meaning here.

An act is considered to be in the course of
the commission of a theft if it occurs in an
attempt to commit the theft, during the
commission of the theft itself, or in the
immediate flight after the attempt or
commission of theft.

Bodily injury means any physical pain, illness
or impairment of physical condition.

The word force means any amount of physical
power or strength used against the victim.
The force need not entail pain or bodily harm
and need not leave any mark.

In order to find [defendant] guilty of
robbery, the State must prove beyond a
reasonable doubt the following:

One, that [defendant] was in the course of
committing a theft.

Two, that while in the course of committing
the theft, [defendant]: A, knowingly inflicted
bodily injury upon Lisa Armstrong or B,
knowingly used force upon Lisa Armstrong or
C, knowingly threatened Lisa Armstrong with
or purposely put her in fear of immediate
bodily injury.

If the State has proved beyond a reasonable
doubt all of the elements of the crime of
robbery, then the verdict must be guilty.

If the State has [f]ailed to prove any element
of that crime beyond a reasonable doubt, you
must find [defendant] not guilty.

 . . . .

 18 A-0135-16T4
 [Defendant's] conviction on the robbery charge
 is a predicate to any consideration of the
 felony murder charge. Therefore, again, if
 the State has failed to prove beyond a
 reasonable doubt the charge of robbery, then
 you should not consider the felony murder
 charge upon which it is predicated.

 It is not necessary to provide a jury with a specific

definition of a term the jury can plainly understand due to its

own knowledge or experience. See State v. Brannon, 178 N.J. 500,

510-11 (2004) (finding the terms "force" and "violence" do not

require any specialized definitions); see also State v. Belliard,

415 N.J. Super. 51, 71-74 (App. Div. 2010), certif. denied, 205

N.J. 81 (2011) (holding the trial court's failure to define

"attempt" in its jury charge was not reversible error).

 It is certainly the better practice to include the definition

of theft in the robbery instruction, consistent with the model

jury charge. However, the court's failure to do so here was not

fatal. We do not view the term theft as so vague or esoteric as

to lie beyond the ken of the average juror. Moreover, the jury

was presented with evidence that cash, jewelry, and other personal

items were taken from Armstrong's home. Given those facts, the

meaning of theft was self-evident, and all the other elements of

robbery were enumerated in the jury charge. On these facts, while

the judge's failure to define theft for the jury was error, this

 19 A-0135-16T4
error was not sufficient to lead the jury to a result it would not

have otherwise reached. R. 2:10-2.

 C.

 We next address the points raised in defendant's pro se

supplemental brief. Having reviewed the record, we conclude these

arguments warrant little discussion.

 In a pretrial motion, defendant asserted various challenges

to the issuance of three separate CDWs and sought to suppress the

evidence derived from them. The trial judge denied the motion,

reasoning:

 Hawkins and defendant [] exchanged
 communications at 2:15 a.m. and 4:17 a.m. on
 October 7, 2013. Those communications served
 as a catalyst for [] defendant's statement to
 police, and a probable aid to their
 identification of him as the male escorting
 Armstrong with her hands behind her back and
 placing her into Hawkins'[s] car as recorded
 by a video surveillance camera.

 Although defendant in his brief sought a
 Franks[2] hearing, contending that Fenkel's
 characterization of defendant's
 communications with Hawkins as "frequent" was
 a material misrepresentation, he eschewed a
 formal Franks hearing, arguing only that use
 of the word "frequent," as used by Fenkel in
 his October 9th affidavit, was a material
 misrepresentation which misled the court. In
 any event, the court finds no breach of the

2
 Franks v. Delaware, 438 U.S. 154, 170, 98 S. Ct. 2674, 2684, 57
L. Ed. 2d 667, 681 (1978).

 20 A-0135-16T4
 rules which govern a challenge to the issuance
 of a search warrant as expressed in Franks and
 Howery.[3] An examination of Fenkel's
 affidavit and his use of the word "frequent"
 to describe twenty-one communications or
 attempted communications . . . between Hawkins
 and defendant does not constitute a knowing
 misrepresentation that would mislead a court.

 Defendant further asserts that Fenkel's
 affidavits fail to establish probable cause
 for the issuance of a search warrant, and even
 assuming probable cause existed, the State was
 not authorized to seize constitutionally
 protected cell phone information.

 Probable cause has been defined as more
 than a naked suspicion but less than legal
 evidence necessary to convict. Here, the
 court is satisfied that probable cause
 abounded for issuance of all three of the
 CDWs. When the court issued the initial
 search warrant – the one for Armstrong's phone
 – it was aware of her identity, the
 approximate time and location of her death,
 and that her family members had provided her
 cell phone number to police. Unable to locate
 Armstrong's phone, the police sought her cell
 phone records for one month preceding the date
 of her death – an obvious beginning point in
 any effective investigation that might uncover
 evidence leading to her killer.

 Examination of Armstrong's phone records
 revealed numerous contacts with Hawkins
 surrounding the [ap]proximate time of death
 and warranted an examination of Hawkins'[s]
 cell phone records that might reveal her
 complicity or that of others. In turn,
 Hawkins'[s] records revealed frequent contact
 with [defendant] before and after Armstrong's
 death. The court is satisfied that probable

3
 State v. Howery, 80 N.J. 563, 566-68, cert. denied, 444 U.S.
994, 100 S. Ct. 527, 62 L. Ed. 2d 424 (1979).

 21 A-0135-16T4
 cause for issuance of [] Hawkins'[s] and
 [defendant's] cell phone records existed and
 that the CDWs were properly issued.

 Our Supreme Court has established the standard of review

applicable to a trial judge's ruling on a motion to suppress:

 We are bound to uphold a trial court's factual
 findings in a motion to suppress provided
 those findings are supported by sufficient
 credible evidence in the record. Deference
 to those findings is particularly appropriate
 when the trial court has the opportunity to
 hear and see the witnesses and to have the
 feel of the case, which a reviewing court
 cannot enjoy. Nevertheless, we are not
 required to accept findings that are clearly
 mistaken based on our independent review of
 the record. Moreover, we need not defer to a
 trial . . . court's interpretation of the law
 because legal issues are reviewed de novo.

 [State v. Watts, 223 N.J. 503, 516 (2015)
 (alteration omitted) (citations omitted).]

 In appealing the denial of the suppression motion, defendant

renews the arguments he presented to the trial court. Guided by

the above standard, we discern no reason to disturb the judge's

ruling, which we affirm substantially for the reasons expressed

in the judge's thoughtful written opinion.

 Defendant also sought to exclude admission of his

conversations with Hawkins, which were recorded by prison

officials while defendant was an inmate at the Burlington County

Jail. Relying on State v. Fornino, 223 N.J. Super. 531, 542-48

(App. Div. 1988), the trial judge found these conversations were

 22 A-0135-16T4
lawfully recorded. Defendant's arguments to the contrary lack

sufficient merit to warrant further discussion. R. 2:11-3(e)(2).

 D.

 Lastly, we address sentencing issues. As noted, the trial

court applied the "Three Strikes Law," N.J.S.A. 2C:43-7.1a, in

sentencing defendant to life imprisonment without parole on Count

One for knowing or purposeful murder. The statute requires a

court to impose a term of life imprisonment, with no eligibility

for parole, for a third conviction of certain enumerated offenses,

including N.J.S.A. 2C:15-1 (robbery). However, N.J.S.A.

2C:43-7.1a has been construed to apply only to predicate crimes

of first-degree robbery. See State v. Jordan, 378 N.J. Super.

254, 258-61 (App. Div. 2005) (rejecting sentencing under N.J.S.A.

2C:43-7.1a where one of the predicate crimes was second-degree

robbery).

 In the present case, prior to imposing a sentence of life

without parole pursuant to N.J.S.A. 2C:43-7.1a, the trial court

indicated defendant had prior convictions for first-degree robbery

in 1993 and 1999. However, as defendant points out, defendant's

1993 conviction was for second-degree robbery. Defendant thus

argues, and the State concurs, that N.J.S.A. 2C:43-7.1a does not

apply because defendant only has one prior first-degree robbery

conviction. Accordingly, we vacate the sentence imposed on Count

 23 A-0135-16T4
One and remand for resentencing absent application of that

statutory provision.

 Additionally, although not specifically argued by defendant,

our independent review of the record indicates he was convicted

on Count Five of second-degree, rather than first-degree, robbery.

Generally, robbery is a second-degree crime, except it is elevated

to first-degree "if in the course of committing the theft the

actor attempts to kill anyone, or purposely inflicts or attempts

to inflict serious bodily injury, or is armed with, or uses or

threatens the immediate use of a deadly weapon." N.J.S.A.

2C:15-1b.

 Here, the indictment specifically alleged defendant was armed

with a deadly weapon in the course of committing a theft. The

jury was asked to consider only the additional element of being

armed, and none of the alternative elements that would raise the

crime from second-degree to first-degree robbery. The jury found

the State failed to prove beyond a reasonable doubt that defendant

committed the robbery while armed with a deadly weapon.

Nonetheless, the court sentenced defendant to a twenty-year prison

term, exceeding the ten-year maximum for second-degree offenses.

We are therefore constrained to remand the matter to the trial

court to correct the judgment of conviction to reflect defendant's

 24 A-0135-16T4
conviction for second-degree robbery on Count Five, and to

resentence defendant accordingly.

 Affirmed in part; reversed and remanded in part. Jurisdiction

is not retained.

 25 A-0135-16T4