**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3206-18
A-3951-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

TYRESE HARRIS,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ABDULLAH STEWART,

      Defendant-Appellant.

_____

      Argued (A-3206-18) and Submitted (A-3951-18)
December 9, 2021 – Decided March 10, 2022

      Before Judges Alvarez and Haas.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 16-10-2978, 17-07-2031 and 17-08-2284.

Zachary G. Markarian, Assistant Deputy Public Defender, argued the cause for appellant Tyrese Harris (Joseph E. Krakora, Public Defender, attorney; Zachary G. Markarian, of counsel and on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant Abdullah Stewart (John A. Albright, Designated Counsel, on the brief).

Kaili E. Matthews, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Kaili E. Matthews, of counsel and on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Matthew E. Hanley, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

We consolidate for decision co-defendants Tyrese Harris and Abdullah Stewart's appeals from their convictions and sentences. We affirm.

The State established the following during Harris and Stewart's trial.[1] Between 8:30 and 9:00 p.m. on May 4, 2017, Ricardo Rios and his wife Marcie Ramos were walking home from a grocery store in a residential area in Newark.

---

[1] The jury acquitted Nathan Fluitt, a third co-defendant who drove the car in which defendants were stopped.

Two men wearing ski masks approached the couple from behind. The man in front wore a red shirt, a white jacket, and dark pants. He pointed a handgun at Rios, demanding Rios's wallet and cell phone. The other man stood behind the first, dressed all in black. Rios handed over his wallet. The men then asked Ramos "if [she] had something to give them." Ramos said she had nothing.

As the two men walked away toward Adams Street, Rios surreptitiously followed them because he anticipated they would discard his wallet after emptying the cash. Once on Adams Street, Rios saw the men remove their ski masks before approaching a passerby, Jorge Inaguazo, who was walking home from work.

The location where Inaguazo encountered the two men was well-lit. Inaguazo described the man who stood to his right as approximately the same height as himself, slender, and as wearing black pants, a black jacket, and a wool cap. He described the man on his left, who had facial hair, as wearing black pants and a red and white shirt. They asked Inaguazo for directions to Ferry Street.

After Inaguazo gave the men directions, they stood for a few moments before leaving. When they walked away, Rios approached Inaguazo and asked him to call police. He did so, and he and Rios followed the men. Inaguazo and

3

Rios watched them rob an elderly man in an alley, take his backpack and wallet, and head towards Oliver Street.

Rios and Inaguazo observed the men get into a black Ford Expedition, which drove away. Rios found Officer Michael Maldonado sitting in his squad car and told him that he had just been robbed. As the two men spoke, a third victim, Edwin Cruz, approached Maldonado to report that he too had been robbed.

Cruz told the officer he had just arrived home from work when two black men in ski masks ran up from behind him as he approached his door. One of them wore a black jacket and pointed a handgun at Cruz. The other wore a white jacket. Cruz gave the men his cell phone and his backpack, which contained his wallet and other items. Cruz watched the two men escape in a "big . . . black" vehicle he described as a "truck." Police later recovered security camera film that recorded that robbery.

Maldonado contacted dispatch to put out a be-on-the-lookout (BOLO) for two light-skinned black males in a black Ford Explorer. Maldonado later changed the vehicle description to a black Ford Expedition.

Officers Gabriel Serrano and Steven Calero, on patrol in a marked police vehicle, responded to the BOLO just before 10:30 p.m. when they spotted a

4

black Ford Expedition stopped at a red light. The officers followed, eventually maneuvering in front of the Expedition, and "slowed down." When the light turned green and the Expedition drove forward and passed the police vehicle, the officers "observed two black males" sitting in the front seats. After running the Expedition's plates and finding nothing suspicious, the officers activated their vehicle's lights to pull the Expedition over.

The Expedition turned left, ignoring a red light, and Serrano informed dispatch "[w]e have a Ford Explorer." He radioed that "[t]he Ford Explorer is refusing to stop." Eventually, it pulled over in front of some barricades on Edison Street outside the Prudential Center. The officers left their vehicle with weapons drawn and ordered the driver to turn the engine off. They noticed a third black male in the back seat, who passed something to the front passenger. The two front occupants tried to exit the Expedition, but the officers blocked them in by forcing both of the vehicle's doors closed.

When backup arrived, the officers arrested the Expedition's three occupants. Fluitt was the driver, Harris the front passenger, and Stewart was in the backseat. At trial, Serrano testified the Expedition had been travelling up to forty or forty-five miles per hour, but acknowledged that the police report stated

5

the vehicle's speed was twenty-five miles per hour and that "the suspect voluntarily stopped and surrendered."

Detective Wilmorys Velazquez considered "the possibility of getting a search warrant" but instead decided to obtain consent to search from the vehicle's owner. At trial, Velazquez referred to the owner as "Kenya Turnage." Velazquez drove to Turnage's home to obtain her written consent, returned to the scene, and searched the Expedition. He found cell phones, wallets, keys, masks, gloves, a sweater, a fanny pack containing cash, and a handgun. The phones and wallets belonged to the victims. Forensic testing later confirmed Stewart's DNA profile matched DNA taken from one of the ski masks, a glove, and a grey hooded sweatshirt also found in the Expedition.

The police drove Rios, Cruz, and Inaguazo individually from the station where they had been taken to be interviewed to an area outside the Prudential Center to try and identify the culprits. Officers showed Rios three men, but he could only identify one of them based solely on his clothing—a red shirt and black pants. A few minutes after the identification, police gave Rios his wallet back. Rios described seeing the officers with "a packet with all the ID's of a bunch of people. Mine included." Rios made the identification, which was recorded in writing, at about 11:10 p.m.

A-3206-18

Inaguazo's identification was recorded in writing. In the blank where the identification form prompted documentation of a witness's "own words" and statement of confidence, an officer had written: "Suspect he saw walking on Chestnut St. and asked 'where is Ferry St.'" The form stated Inaguazo first saw the men around 9:30 p.m., and that the identification procedure took place at 11:16 p.m.

When police drove Inaguazo to identify the detained men, he was alone in the car. He was shown two individuals standing in the street, one by one. Inaguazo identified them as the ones who asked him for directions and robbed the older man. He said the lighting was bright in the area of the identification. Inaguazo was shown the individual wearing the black clothing first, whom he identified in court as Harris. He described the second person as wearing a t-shirt that was "between kind of white and red . . . [and] a cap," and identified him in court as Stewart. He testified he was 100% certain of both identifications.

Cruz testified the police drove him to "a street" and showed him two men at once. He could identify neither "because [he] never saw [their faces]" during the robbery, but he confirmed they were "the same height" and had the same body types as his robbers—one skinnier, one heavier. Afterward, police took Cruz back to the station to retrieve his cell phone, wallet, and iPad.

7

Defendants moved for a <u>Wade</u>-<u>Henderson</u>[2] hearing, seeking to suppress the show-up identification. Neither defendant included trial submissions with the appellate record, and both relied on their briefs at oral argument before the trial judge. From the judge's oral decision, however, it appears that defendants challenged the identification procedure based on racial bias, the inherent suggestibility of show-up identifications, and the fact that witnesses viewed defendants in handcuffs.

The trial judge found that "[t]he identification of the defendants occurred at the same date as the allege[d] offense . . . less than two hours after the alleged incidents occurred. The officers followed the proper procedures, [and] completed a show[-]up identification worksheet for each witness that performed an identification." The judge noted that the officers told the witnesses the perpetrators might not be included in the show-up and that they "should not feel compelled to make an identification."

The judge further found it was "not clear from the record whether defendants were indeed in handcuffs" during the identification. Regardless, she stated that presenting the defendants in handcuffs "may be suggestive" but

---

[2] <u>United States v. Wade</u>, 388 U.S. 218 (1967); <u>State v. Henderson</u>, 208 N.J. 208, 300 (2011).

would not be "per [se] improper and unconstitutional." Due to the "closeness in time of the identification to the alleged offense, and the officers' adherence to protocol," the judge found the identification was not impermissibly suggestive. She denied defendants' motion.

Defendants also moved to suppress the evidence seized from the Expedition as the fruits of an unconstitutional search. According to the relevant computer-aided dispatch (CAD) report, the BOLO actually described a black Expedition containing two black males, not three.

Calero testified at the motion hearing that when he turned his sirens and lights on to try and stop the Expedition, "[t]here was some resistance, you know, an eluding . . . ." Calero initially described the Expedition as travelling at a "high rate of speed" despite eventually acknowledging the car's speed was only twenty-five miles per hour, well below the speed limit. The judge denied defendant's suppression motion: "the officers had a right to search for the vehicle for the protection of the public since an alleged handgun was involved in two robberies in the immediate area of the Prudential Center." In reciting the facts, the judge also noted that the Expedition "made an improper lane change."

The trial judge denied the motion despite finding that Calero was not a credible witness. She ultimately concluded the stop was lawful because:

> In this case officers heard a BOLO broadcast informing the officers that two armed robberies had just occurred and the suspects were using a . . . black Ford Expedition that was occupied by at least two black males, [five foot eight] inches tall, wearing dark clothing, and in possession of a black handgun. Defense argues that the officer called in a black Ford Explorer and thus there was no probable cause to stop the defendants and that they were driving a black Ford Expedition.
>
> The Court . . . takes note that the BOLO, according to a police report submitted into evidence, was in fact for a black Ford Expedition, despite the responding officers stating that they were in pursuit of a black Ford Explorer. Thus[,] the Court finds that the investigative stop of the vehicle was lawful.

Therefore, the trial judge found reasonable and articulable suspicion for the stop.

The detectives obtained the owner's valid consent to search, notwithstanding defense counsel's argument that the vehicle owner was a "Kenya Turnage" while the consent was signed by a "Tanika Turnage." The owner of the vehicle was Tanika Turnage according to Division of Motor Vehicle records, and both names were written on the consent to search form. The victims' wallets and cell phones were thus lawfully seized.

During the trial, when the State rested, Stewart's attorney unsuccessfully sought a judgment of acquittal with regard to Ramos because nothing was taken

from her. The judge denied that application because the words used clearly established a robbery—the threat of force while committing a theft.

Both defense counsel requested a "feedback instruction" with regard to the identifications. The trial judge did not give the charge, focusing on the fact the witnesses were individually transported and thus did not have the opportunity to speak to each other about the show-up.

When the State asked for the jury to be instructed as to attempted robbery regarding Ramos, both defense counsel strenuously objected, arguing that neither defendant had notice of an attempt charge. Thus, the trial judge did not grant the State's application.

During deliberations, Harris's parents claimed they overheard jurors in a hallway outside the jury room discussing conspiracy, vacation plans, and the length of the deliberations. One juror is alleged to have said "we want to get this over with today[,]" while another responded "no, hopefully tomorrow or Monday." Harris's parents said when the jurors noticed them, one of the jurors ended the conversation, stating "we should be talking about football."

As a result, the judge conducted individual voir dire of each juror. Juror number one testified that another juror had mentioned her concern that she would be "unable to reschedule" her upcoming vacation plans. Juror six stated

"one of the Jurors has vacation next week, so in the event that it does extend to that period, she would not be able to continue to be one of the deliberators." Another juror stated in the hallway that he or she had "changed their mind[]" about something.[3]

When asked point-blank whether any jurors wanted to finish deliberations soon, juror ten testified "people might have said that, but not meaning it the way that it might have been taken. . . . Nobody is rushing to judgment just so they can leave." Yet another juror confirmed that some jurors had briefly continued a discussion of conspiracy in the hallway before another juror reminded them to stop. As she spoke to individual jurors, the judge remarked that the jury was not to rush to judgment.

Defendants moved for a mistrial, contending that roughly half the jury was exposed to outside deliberations and heard comments about another's impending vacation plans. The judge found the conversation not to have been substantive, therefore she denied the motion. She further stated that she repeatedly reminded the jury during the lengthy voir dire process that they could not discuss the case outside of the jury deliberation room. Not all jurors were told during the

---

[3] The transcript reads: "One of the [j]urors was . . . saying that they changed their minds about (indiscernible)."

A-3206-18

individual voir dire, however, not to reach a verdict just to accommodate a panelist's vacation plans. However, neither defense attorney requested such an instruction to be given to the panel.

The jury convicted defendants of the following charges: second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1 (count one); first-degree robbery, N.J.S.A. 2C:15-1 (counts two, five, and eleven); third-degree theft by unlawful taking,[4] N.J.S.A. 2C:20-3(a) (counts three and six); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count eight); and second-degree possession of a weapon for unlawful purposes, N.J.S.A. 2C:39-4(a) (counts nine, ten, and thirteen).[5] Both Stewart and Harris were less than twenty-six years of age at the time of the incident.

On January 28, 2019, defendants were sentenced. The judge imposed concurrent fifteen-year prison terms upon Stewart, subject to eighty-five percent parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for the robberies, and merged the remaining convictions, except for a concurrent

---

[4] Harris's judgment of conviction lists count three as a fourth-degree offense.

[5] The jury found defendants not guilty of fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4) (counts four, seven, and twelve) and third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a) (counts fifteen and sixteen).

sentence of five years with forty-two months' parole ineligibility for unlawful possession of a handgun. The judge found aggravating factors three, six, and nine, and no factors in mitigation. See N.J.S.A. 2C:44-1. Harris received a thirteen-year sentence subject to eighty-five percent parole ineligibility under NERA for the robberies, and on the unlawful possession of a weapon charges, received a concurrent sentence of five years' imprisonment subject to forty-two months of parole ineligibility. The remaining offenses were merged into the robberies.

Now on appeal, Stewart raises the following points:

POINT I

THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR A WADE HEARING CONCERNING THE SHOW[-]UP OUT-OF-COURT IDENTIFICATION PROCEDURE UTILIZED BY POLICE WHICH INCLUDED PRESENTATION OF THE DEFENDANTS IN HANDCUFFS TO THE PARTICIPANTS.

POINT II

THE TRIAL COURT'S ORDER DENYING SUPPRESSION OF ITEMS SEIZED FROM THE EXPEDITION MUST BE REVERSED.

A.    The description of the suspects as "two black males" in a black Ford Explorer did not provide police with reasonable and particularized

14

suspicion to justify the investigatory stop of three black males traveling in a Ford Expedition.

B.    Even if the stop was lawful, the warrantless entry into and search of the vehicle were not justified by an exception to the warrant requirement.

POINT III

THE LOWER COURT ERRED IN DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL ON COUNTS [ELEVEN] AND [THIRTEEN], AS THE STATE ADMITTED THAT IT HAD PRESENTED ABSOLUTELY NO EVIDENCE THAT A THEFT OCCURRED FROM RAMOS; ALTERNATIVELY, ATTEMPT WAS AN ESSENTIAL ELEMENT OF ROBBERY AND THE JUDGE'S REFUSAL TO INCLUDE IT IN THE CHARGE WAS REVERSIBLE ERROR.

A.    When the State presented insufficient evidence to sustain all elements of armed robbery, i.e. a theft, under Count [eleven], the motion for judgment of acquittal should have been granted.

B.    Under circumstances in which nothing is taken from the alleged victim, attempt is an element of robbery, and the court's failure to instruct the jury accordingly necessitates reversal.

POINT IV

FOLLOWING VOIR DIRE WHICH OVERWHELMINGLY ESTABLISHED JUROR MISCONDUCT, THE DENIAL OF DEFENDANT'S MOTION FOR A MISTRIAL DENIED HIM A FAIR TRIAL; ALTERNATIVELY, EXPLICIT INSTRUCTIONS ON FURTHER DELIBERATIONS

15

WERE NECESSARY TO SALVAGE SOME SEMBLANCE OF UNTAINTED DELIBERATIONS.

A. Jurors' vacation plans and deliberation outside the jury room had the clear capacity to result in a verdict subject to those outside influences in a manner inconsistent with the evidence and law.

B. After it was revealed that jurors had vacation plans that would interfere with fair deliberations on the case, the lower court erred when it failed to instruct the jury on further deliberations.

POINT V

THE IDENTIFICATION CHARGE WAS INCOMPLETE AND NOT TAILORED TO THE FACTS OF THIS CASE, AND THEREFORE, THE CHARGE DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.

POINT VI

A REMAND FOR RESENTENCING FOR CONSIDERATION OF THE YOUTH MITIGATING FACTOR, "THE DEFENDANT WAS UNDER [TWENTY-SIX] AT THE TIME OF THE COMMISSION OF THE OFFENSE," IS NECESSARY.

On appeal, Harris raises the following points:

POINT I

A GENERIC DISPATCH THAT BLACK MEN HAD FLED A ROBBERY IN A BLACK FORD SUV DID NOT PROVIDE REASONABLE AND ARTICULABLE SUSPICION TO STOP

16

DEFENDANTS' CAR NEARLY AN HOUR LATER IN DOWNTOWN NEWARK ON AN EVENING WITH HEAVY TRAFFIC. THE EVIDENCE FOUND IN THE CAR SHOULD BE SUPPRESSED.

POINT II

THE TRIAL COURT ERRED IN REFUSING TO CONDUCT A <u>WADE</u> HEARING BEFORE ADMITTING THE UNRECORDED AND HIGHLY SUGGESTIVE SHOW[-]UP IDENTIFICATION AND AN UNRELIABLE IN-COURT IDENTIFICATION.

A.    The Court Erred In Denying a Pre-Trial Hearing Because Police Did Not Record the Show[-]up Identification Procedure.

B.    The Court Also Erred in Denying a <u>Wade</u> Hearing Despite Extensive Evidence of Suggestiveness Indicating the Identifications Were Unreliable.

C.    The Court Erred in Permitting Inaguazo to Make an In-Court Identification of Harris and Stewart Because the In-Court Identification Was Tainted by the Suggestive Show[-]up Identification.

D.    The Court's Failure to Hold a Pre-Trial <u>Wade</u> Hearing Was Prejudicial and Compels Reversal of Defendant's Convictions.

POINT III

THE TRIAL COURT ERRED IN REFUSING TO CHARGE THE JURY REGARDING THE EFFECT OF FEEDBACK AND TO TAILOR THE CHARGE TO REFERENCE RIOS'S IDENTIFICATION.

17

POINT IV

AFTER CONDUCTING A VOIR DIRE OF THE JURY ABOUT THEIR DELIBERATIONS, THE TRIAL COURT ERRED IN MAKING OFF-THE-CUFF REMARKS TO EACH JUROR INDIVIDUALLY RATHER THAN CHARGING THEM ALL PURSUANT TO THE MODEL CHARGE ON FURTHER JURY DELIBERATIONS.

POINT V

THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DENIED [DEFENDANT] A FAIR TRIAL.

POINT VI

THIS COURT SHOULD REMAND FOR RESENTENCING FOR THE TRIAL COURT TO RECONSIDER DEFENDANT'S SENTENCE BASED ON THE NEW MITIGATING FACTOR, "THE DEFENDANT WAS UNDER [TWENTY-SIX] YEARS OF AGE AT THE TIME OF THE COMMISSION OF THE OFFENSE."

I.

We combine our discussion of Stewart's first point and Harris's second, that the trial court's failure to conduct a Wade hearing was reversible error. A conviction following an erroneous ruling on a Wade-Henderson motion will not

be overturned if the ruling was harmless beyond a reasonable doubt. State v. Jones, 224 N.J. 70, 85 (2016); see also Henderson, 208 N.J. at 300.[6]

Defendants contend they were entitled to a hearing because the requisite show-up identification procedures worksheets were not completed, or were completed incorrectly. In addition, defendants were handcuffed when presented to the eyewitnesses.

This show-up was somewhat unusual in that the victims could only identify their assailants by their clothing, as the robbers wore masks which obscured their features. Only Inaguazo, who saw the men in an encounter free of situational stress,[7] could identify the robbers' facial features, weight, and relative size.

This show-up occurred prior to the Supreme Court's decision in State v. Anthony, 237 N.J. 213 (2019). That case requires police to electronically record a show-up, or make some other contemporaneous written record of the

---

[6] Jones analyzed the identification at issue under the pre-Henderson framework. However, it appears that the harmless error rule survived Henderson. Henderson, 208 N.J. at 300 ("We do not review the record for harmless error only because the parties have not yet argued that issue.").

[7] See Henderson, 208 N.J. at 262 ("We find that high levels of stress are likely to affect the reliability of witness identifications. . . . [S]tress . . . must be assessed based on the facts presented in individual cases.").

procedure.  Id. at 233-34.  Defendants argue the failures to complete the forms properly or to comply with Rule 3:11 warranted a Wade hearing.  In Anthony, the Court held defendants are entitled to Wade hearings when the documentation requirements of Rule 3:11 are not heeded, even without other evidence of suggestiveness.  The show-up in this case, however, preceded Anthony.

Show-ups are not per se unconstitutional.  Nor were defendants' handcuffs, standing alone, impermissibly suggestive.  On that point, the judge made no finding as to whether defendants were handcuffed.

It is clear from the record, however, that Rios, Inaguazo, and Cruz all viewed defendants separately.  They did not discuss their identifications with the officers or with each other.  The identifications were clearly significant: Fluitt, who the eyewitnesses did not identify at the show up, was not convicted. In reviewing the record, it appears that Inaguazo's out-of-court and in-court identifications were pivotal.  The show-up occurred less than two hours after the robberies.  See State v. Wright, 444 N.J. Super. 347, 362-63 (App. Div. 2016). Defendants bear the burden to demonstrate that the police failed to create an adequate record of the show-up, resulting in an unjust result.  Henderson, 208 N.J. at 238-39.

No doubt, police could have been more thorough in documenting the show-up. However, they implemented some basic safeguards during the process supporting the judge's conclusion the show-up was not impermissibly suggestive.

The officers who drove the victims and Inaguazo past defendants had no knowledge of the identifiers that had been previously given. It is constitutionally permissible for the suspects to be handcuffed in this situation. The record does not contain any indication that Rios, Inaguazo, and Cruz spoke to each other before or after. Each viewed the suspects individually.

Nor do we agree that return of the victims' stolen items constituted feedback. The victims were entitled to get their property back. This fast police work involved a vehicular chase on a crowded street in front of a busy entertainment venue. Police had to act quickly. Under these circumstances, the show-up at issue was not impermissibly suggestive. The incomplete or erroneously completed forms in this case did not, prior to Anthony, require a Wade hearing.

II.

On appeal, we uphold the findings of a trial judge where "supported by sufficient credible evidence in the record." State v. Boone, 232 N.J. 417, 425–

21

26 (2017) (quoting State v. Scriven, 226 N.J. 20, 40 (2016)). Factual findings warrant reversal only where so clearly mistaken that the interests of justice demand intervention. Id. at 426 (citing State v. Elders, 192 N.J. 224, 244 (2007)). No deference is owed to the trial court's conclusions of law, which are reviewed de novo. Ibid. (citing State v. Watts, 223 N.J. 503, 516 (2015)).

Both defendants challenge the trial court's decision denying the motion to suppress evidence seized as a result of the car stop. But for the fact that the vehicle was identified by the victims and Inaguazo, this case might fall within the parameters of State v. Nyema, ___ N.J. ___ (2022). In this case, however, police had reasonable suspicion to make the investigatory stop. See State v. Williams, 192 N.J. 1, 9 (2007) (Williams I).

Reasonable suspicion is a less demanding standard than probable cause. State v. Stovall, 170 N.J. 346, 363 (2002). It requires only that "specific and articulable facts . . . taken together with rational inferences from those facts, give rise to a . . . suspicion of criminal activity." Williams I, 192 N.J. at 9 (quoting State v. Pineiro, 181 N.J. 13, 20 (2004)). However, even if a stop is unsupported by reasonable suspicion, a suspect must comply. Id. at 11.

Williams I also established the following three-factor test to determine whether physical evidence is sufficiently attenuated from unconstitutional

police conduct so as to remain admissible: "(1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct." Id. at 15.

The bottom line is that a black SUV—be it an Explorer or an Expedition—was identified as being driven by the robbers. Defendants were stopped after refusing to pull over and ignoring a red light, although the judge found the testifying officer not credible regarding the vehicle's speed. The stop occurred near the crime scene. The directive to stop a vehicle containing two black men in a black Expedition or Explorer sufficed to justify the investigatory stop here.

Once the vehicle was stopped and the occupants removed, the subsequent search was supported by the valid consent of the owner. As both of the owner's possible names were used, we are satisfied that the owner gave valid and voluntary consent to the search. Thus, the stop was supported by reasonable suspicion, and the subsequent search by the owner's consent.

## III.

Stewart and Harris both contend the jury instructions were fatally flawed. Stewart also contends his motion for mistrial should have been granted because

juror "misconduct" occurred—namely, the jurors' conversations regarding the case and impending vacation plans.

The point lacks merit. The trial judge individually voir dired each juror, and all confirmed they did not feel compelled to rush to judgment. Each juror responded appropriately. We review decisions denying motions for a mistrial for abuse of discretion. State v. Smith, 224 N.J. 36, 47 (2016). The record does not support the claim that an abuse of discretion occurred here.

Harris contends the judge erred by failing to instruct the jury as if they had deadlocked. The jury here did not deadlock—in fact, the concern was that they would rush through deliberations. But each individual juror denied any intent to rush to judgment. The juror deadlock instruction was not requested. There was no plain error.

Furthermore, the judge charged the jury with the same language now relied upon by defense counsel on appeal. The language defense counsel claims should have been given—that jurors must not "surrender [their] honest conviction as to the weight or effect of evidence solely because of the opinion of [their] fellow jurors, or for the mere purpose of returning a verdict"—was included in the general closing charge:

> [i]n the course of your deliberations do not hesitate to
> re-examine your own views and change your opinion if

> convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict."

This point will not be discussed further. See R. 2:11-3(e)(2).

"Proper jury instructions are essential to ensuring a fair trial." State v. Robinson, 165 N.J. 32, 40 (2000). We are satisfied that the judge's instruction with regard to identification adequately served its purpose.

The record is devoid of any facts that establish the witnesses received feedback. The judge gave the model jury charge on identification. See Model Jury Charges (Criminal), "Identification: In-court and out-of-court identifications, (rev. May 18, 2020). Even if the court only mentioned Inaguazo as identifying defendants in court, that cannot be described as error—he is the only one who saw defendants without masks. Just because she named only Inaguazo does not mean that the jury would have ignored the balance of the instruction discussing eyewitness evidence in some detail. There is no question that Rios and Cruz identified the perpetrators only by clothing, and thus could not identify the perpetrators in the courtroom. The judge did not err by failing to give the feedback instruction.

Both defendants contend that since they were under the age of twenty-six, they should receive the benefit of a remand resentence hearing because N.J.S.A. 2C:44-1(b)(14) was enacted after their sentence date. In State v. Bellamy, 468 N.J. Super. 29 (App. Div. 2021), we considered that very argument. We concluded that Bellamy was not a stand-alone basis for a resentence as defendants urge here.

V.

Stewart argues that the court wrongfully denied his motion for a judgment of acquittal on count eleven, alleging first-degree robbery as to Ramos, and count thirteen, alleging possession of a weapon for an unlawful purpose as to Ramos. Defendant relies on State v. Gonzalez, 318 N.J. Super. 527 (App. Div. 1999), in which the State did not produce evidence a victim was actually robbed. Id. at 533. The judge in that case failed to instruct the jury about attempt to commit robbery where the actual charge was felony murder. Id. at 536. We reversed because the attempted robbery was a necessary predicate to the felony murder offense.

A defendant may be convicted of robbery if in the course of committing a theft or attempted theft he "(1) [i]nflicts bodily injury or uses force upon another;

or (2) [t]hreatens another with or purposely puts him in fear of immediate bodily injury; or (3) [c]ommits or threatens immediately to commit any crime of the first or second degree."  State v. Farrad, 164 N.J. 247, 256-57 (2000) (quoting N.J.S.A. 2C:15-1(a)); see also State v. Whitaker, 200 N.J. 444, 459 (2009) (quoting Farrad, 164 N.J. at 573) ("Committing or attempting to commit a theft is a necessary element of the crime of robbery.").  Use of a deadly weapon elevates robbery to a first-degree crime.  State v. Williams, 218 N.J. 576, 587-88 (2014) (Williams II); N.J.S.A. 2C:15-1(b).

"A person is guilty of theft 'if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof.'"  Whitaker, 200 N.J. at 459-60; N.J.S.A. 2C:20–3(a).  A person is guilty of attempting to commit a crime when he:

> (1) Purposely engages in conduct which would constitute the crime if the attendant circumstances were as a reasonable person would believe them to be; (2) When causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing such result without further conduct on his part; or (3) Purposely does or omits to do anything which, under the circumstances as a reasonable person would believe them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.
>
> [N.J.S.A. 2C:5-1(a).]

27

In other words, "a defendant can be convicted of robbery, <u>even if the theft is unsuccessful</u>, if he or she (1) purposely takes a substantial step (2) to exercise unlawful control over the property of another (3) while threatening another with, or purposely placing another in fear of, immediate bodily injury." <u>Farrad</u>, 164 N.J. at 258 (citing <u>State v. Sein</u>, 124 N.J. 209, 215 (1991) (emphasis added)).

Generally, "an attempt or conspiracy to commit a crime of the first degree is a crime of the second degree[.]" N.J.S.A. 2C:5-4(a). "Otherwise[,] an attempt is a crime of the same degree as the most serious crime which is attempted, and conspiracy is a crime of the same degree as the most serious crime which is the object of the conspiracy[.]" <u>Ibid.</u>

The trial court has an independent duty "to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party." <u>State v. Reddish</u>, 181 N.J. 553, 613 (2004). Further, "a trial court has an independent obligation to instruct on lesser-included charges when the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense." <u>State v. Jenkins</u>, 178 N.J. 347, 361 (2004). "[I]nadequate" jury charges warrant reversal. <u>State v. Jackmon</u>, 305 N.J. Super. 274, 290 (App. Div. 1997).

However, "[m]istakes at trial are subject to the invited-error doctrine. Under that settled principle of law, trial errors that were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal. . . ." State v. A.R., 213 N.J. 542, 561 (2013) (citations omitted). "In other words, if a party has 'invited' the error, he is barred from raising an objection for the first time on appeal." Ibid. Because defendants' attorneys actively objected to the requested attempt instruction, the invited error doctrine bars this argument.

Ramos stood by her husband while defendants pointed a gun at her and asked if she had anything to give them. When the State requested an instruction on attempt, defendants objected. Even on the merits, we find no error. Defendants threatened Ramos in the course of committing a theft. Only the fact that she had nothing to give defendants thwarted the theft.

VI.

Finally, Harris contends that the cumulative errors warrant reversal. We do not agree. No errors occurred, and none of the alleged errors constituted an unfairness that prejudiced his right to a fair trial. The trial was fair. Nothing in the record "raise[s] a reasonable doubt as to whether the error[s] led the jury to

29

a result it otherwise might not have reached." See State v. Macon, 57 N.J. 325, 336 (1971); State v. Weaver, 219 N.J. 131, 155 (2014).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3206-18